## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| DAVID MOORE d/b/a MOORE FAMILY FARMS; TERRY LUSK, JASON LUSK, AND JUSTIN LUSK d/b/a JTJ FARMS; KEVIN RENTZ, AMANDA CALHOUN RENTZ, DENNIS BRUCE RENTZ, and KARLA JO RENTZ d/b/a RENTZ FAMILY FARMS; KEVIN COGGINS d/b/a MEK FARMS; BOWLES FARMING COMPANY, INC.; AGROPECUARIA LOS AMERICANOS S.C. de R.L. de C.V.; PHIL SANDIFER & SONS FARMS LLC; JMB FARM LLC; POWE FARMS MANAGEMENT LLC; CA COMERCIAL, S.A.C.; GLOBAL FRESH, S.A.C.; and PEPAS TROPICALES DEL PERU, S.A.C., individually and on behalf of all others similarly situated, | Case No. 4:20-cv-252 |

Plaintiffs,

*vs*.

C.H. ROBINSON WORLDWIDE, INC. d/b/a
C.H. ROBINSON COMPANY, INC., C.H.
ROBINSON COMPANY, and ROBINSON
FRESH,

Defendants.

**CLASS ACTION COMPLAINT
AND
DEMAND FOR JURY TRIAL**

Plaintiffs, being (1) David Moore d/b/a Moore Family Farms ("Moore Family"),

(2) Terry Lusk, Jason Lusk, and Justin Lusk individually and collectively d/b/a JTJ

Farms, ("JTJ Farms"), (3) Kevin Rentz, Amanda Calhoun Rentz, Dennis Bruce Rentz,

and Karla Jo Rentz individually and collectively d/b/a Rentz Family Farms ("Rentz

Family"), (4) Kevin Coggins d/b/a MEK Farms ("MEK Farms"), (5) Bowles Farming

Company, Inc. ("Bowles"), (6) Agropecario Los Americanos S.C. de R.L. de C.V.

("Agropecario"), (7) Phil Sandifer & Sons Farms LLC ("Sandifer"), (8) JMB Farm LLC ("JMB"), (9) Powe Farms Management LLC ("Powe"), (10) CA Comerical, S.A.C. ("CA Commercial"), (11) Global Fresh, S.A.C., ("Global Fresh"), and (12) Pepas Tropicales del Peru, S.A.C. ("Pepas Tropicales"), individually and on behalf of all others similarly situated, bring this Class Action Complaint jointly and severally against Defendants, C.H. Robinson Worldwide, Inc. ("CHR Worldwide") d/b/a C.H. Robinson Company, Inc. ("CHR Inc."), C.H. Robinson Company ("CHR Company"), and Robinson Fresh, allege and state as follows:

## I.    NATURE OF THE ACTION.

1.      This action stems from the Defendants' collective unlawful conduct in violation of the Perishable Agricultural Commodities Act of 1930, as amended ("PACA"), 7 U.S.C. § 499a, *et seq.* and various state laws.

## II.    INTRODUCTION.

A.    *Defendants' Background and Summary of Their Illegal Conduct.*

2.      Defendant, CHR Worldwide was founded in 1905 and originally engaged in sourcing services of buying, selling, and marketing of fresh fruits, vegetables, and other perishable items. Over time CHR Worldwide began providing freight transportation services and logistics solutions to companies of all sizes, in a wide variety of industries but, in addition to its new transportation and logistics services, CHR Worldwide continued its original business of sourcing fresh produce.

3.      CHR Worldwide is now a publicly traded Fortune 500 company valued at approximately $11.4 billion (as of January 16, 2020), in 2018 alone it raked in total

revenues of $16.6 billion, and today CHR Worldwide bills itself one of the largest third-party logistics companies in the world with the overwhelming majority of its revenue being generated by its transportation and logistics operating segments.

4.      CHR Worldwide's ticker symbol is CHRW on the NASDAQ Stock Market.

5.      In 2014, CHR Worldwide created a new global business brand named Robinson Fresh® that solely speaks to the company's prior focus on fresh products and offers a clear identity within the produce industry. CHR Worldwide markets Robinson Fresh to the produce industry, the public, and its investors as a separate division that exclusively provides sourcing services of buying, selling, and marketing of fresh fruits, vegetables, and other perishable items to growers, grocery retailers, restaurants, foodservice distributors, and produce wholesalers.

6.      In reality, Robinson Fresh is solely staffed with CHR Worldwide employees who create, control, and implement all of its illegal policies and practices described herein.

7.      Neither CHR Worldwide nor Robinson Fresh holds a PACA license (or in state licenses where one is required)—a legal requirement to CHR Worldwide's ability to engage in the business of buying, selling, and marketing of fresh fruits and vegetables. Despite that, CHR Worldwide deceptively holds itself out to farmers ("Growers"), courts, its customers, the general public, and its investors as holding such licenses.

8.      CHR Worldwide, CHR Company, and CHR Inc., acting through their common executive officers and other employees, jointly engaged in illegal, unfair,

unconscionable, and deceptive business practices to gain an economic advantage over its law-abiding competitors by defrauding struggling Growers such as the Plaintiffs and putative class members who are located throughout the United States of America and the world—conduct which PACA and various state laws were specifically enacted to abolish.

9.      In furtherance of its illegal profiteering scheme, CHR Worldwide and its various subsidiaries have for years deceived scores of federal, state, and local courts and government agencies (including the United States Department of Agriculture and Securities and Exchange Commission), generations of family-owned farms, and small, large, locally owned and businesses including grocers, retailers, wholesalers, restaurants—along with those businesses' customers—all of whom are situated throughout the United States and its territories.

10.      CHR Worldwide knows no road too low to travel, or any class of persons or businesses too fragile to victimize, to further its profit-by-deception scheme. **In fact, CHR Worldwide is so brazen in perpetrating its fraud it to the detriment of dupes financially strapped family Growers, that it has even gone as far duping some Growers into becoming unwitting participants to help market and pay for the scheme it is using to *defraud those Growers and other similarly situated Growers*.**

11.      By way of example, since at least 2012 (and possibly as early) as 2007 CHR Worldwide using Robinson Fresh has profited by exploiting the suffering of breast cancer patients, survivors, and their families by "pinkwashing" the marketing of its "MelonUp!® Pink Ribbon Watermelons" to its customers and potential customers. Robinson Fresh claims *it* donated millions of dollars ***on behalf of its retail customers*** to

breast cancer organizations like Susan G. Komen® as part of *its* "endeavor to help the estimated 1 in 8 women who will be affected by this cancer, and to never give up the fight for a cure." In truth, CHR Worldwide secretly charged its Growers for these donations without ever disclosing that fact to its Growers, customers, or the beneficiaries of the *Growers'* monies.

      12.     CHR Worldwide owns the "MelonUp!® Pink Ribbon Watermelons" trademark and Robinson Fresh places the following types of labels on its Growers' produce for retailers to sell:









13.    Robinson Fresh maintains a website at https://www.robinsonfresh.com/en-

us/products/brands/melon-up/ marketing its cancer research benevolence to prospective retail customers (*e.g.,* grocers and wholesalers) telling them they can "**can help support this worthy cause when you purchase MelonUp! Pink Ribbon watermelons**" and promising them "**A sweet way to grow your category**" and "**A powerful opportunity to grow your category**" explaining they can "**sell more**" by "**championing a favorite cause of female shoppers**" and "**Inspire shoppers with a worthy cause**"—boasting "**87% cause-related purchase intent**"—and then luring the customer promises that *Robinson Fresh* makes a **"$2 donation per bin *at no cost to* [the retailer]**."

14.     The following is an example of one marketing video Robinson Fresh maintains on this website boasting about the psychological power its pinkwashing campaign to play on cancer patients' emotions—*all at the defrauded Growers' expense:* (https://www.robinsonfresh.com/en-us/products/brands/melon-up/):



15.     What Robinson Fresh neglects to inform its prospective customers and the general public is that it is secretly charging the Growers for all the money Robinson Fresh claims ***it*** is donating and that it never told the Growers it was overcharging them and adding fraudulent expenses to fund Robinson's pinkwashing campaign.

16.     Perhaps worse than stealing the financially strapped Growers' money, Robinson Fresh duped them into starring in videos designed to defraud *those very Growers* and other Growers, and Robinson Fresh links those videos from its website (https://www.robinsonfresh.com/en-us/products/brands/melon-up/) to its "MelonUp!® Pink Ribbon Watermelons" website to promote its theft campaign. The following are two videos of two Growers who were duped into starring in a video to promote Robinson Fresh's pinkwashing campaign, but who were never told what purpose Robinson Fresh was using the videos even though it wrongfully charged them fictitious expenses to secretly fund Robinson Fresh's donation:





17.     The two family-owned Growers starring in the above videos—Flowers Farms LLC and Shore Sweet Growers LLC—sued the Defendants many months ago about other claims alleged in this complaint, but only recently discovered the "Pink Ribbon" fraud CHR Worldwide was perpetrating without their knowledge or consent.

18.     In short, CHR Worldwide uses its brand "Robinson Fresh" as a means to earn profits by being dishonest with local Growers (to whom it owes a fiduciary duty), retailers, courts, state and federal government agencies, and the general public who—along with CHR Worldwide's honest competitors—have all been harmed by CHR Worldwide's unlawful and deceitful conduct.

19.     In addition to concealing pass-through charges to Growers to pay for its benevolent "donations" to breast cancer organizations, as alleged herein, Defendants' illegal and deceptive business practices also include, but are not limited to, the following:

**Keeping Two Sets of Books—Hidden Charges:**

19.01.     Robinson Fresh engaged in a process of structuring the transportation of consigned produce supplied by Plaintiffs and other growers in a manner that would place additional revenue in its coffers rather than to Plaintiffs.

19.02.     In addition, Robinson Fresh contracted for an additional reduction of 2% of freight charges made by carriers and retained that reduction for itself and did not disclose or pass the savings on to Plaintiffs.

19.03.     Robinson Fresh secretly received profit increments by receipt of secret rebates from seed suppliers from whom Growers purchased seeds.

These rebates were paid from the funds that Growers, such as Plaintiffs, paid the seed company for seeds used to produce crops they consigned to Robinson Fresh.

19.04.     Robinson Fresh secretly received rebates of fees paid by Plaintiffs and other Growers paid to pallet rental companies under a contract with CHEP USA. The rebates were paid from funds that Growers, such as Plaintiffs, paid to CHEP USA for pallets used in the transportation of the produce consigned to Robinson Fresh.

19.05.     On information and belief, Robinson Fresh received rebates from other third-party suppliers based upon payments made by Plaintiffs to these third-party suppliers of goods and services in connection with the produce consigned to Robinson Fresh by Plaintiffs.

19.06.     Robinson Fresh paid undisclosed and unauthorized promotional rebates, expenses and allowances to purchasers of produce supplied by one or more of the Plaintiffs.

20.     Robinson Fresh added false charges to Plaintiffs and other Growers packing, labeling, and other items which it used to pay for its "donations." CHR Worldwide's executive officers knowingly engaged in the illegal conduct alleged herein; they have known about this lawsuit and its facts months *before* it was filed—and even enlisted their attorneys to communicate with Plaintiffs' counsel several times about *when* the lawsuit would be filed. But instead of taking action to end their misdeeds, they doubled-down and literally traded on their knowledge and profited by trading CHRW

stock without disclosing their knowledge of this class action lawsuit—or the facts alleged herein—to clueless CHRW investors.

21.     CHR Worldwide, CHR Company, and Robinson Fresh profess to maintain a *strict* "Code of Ethics" and "Code of Conduct" they profess to follow and demand Growers and others to follow too (*see below,* ***Allegations of Fact,*** Section 5 D-E); however, as alleged in this complaint, the Defendants' "Codes" are merely one-way streets they built for others—and not themselves—to travel.

B.     ***Background Regarding PACA's Purpose and Its Relevant Provisions.***

22.     Congress enacted PACA in 1930 to regulate the marketing of perishable agricultural commodities in interstate and foreign commerce. The primary purposes of the PACA are to prevent unfair and fraudulent conduct, "sharp practices" in the marketing and selling of perishable agricultural commodities and to facilitate the orderly flow of perishable agricultural commodities in interstate and foreign commerce.

23.     The PACA is administered and regulated by the Agricultural Marketing Service, an agency within the United States Department of Agriculture ("USDA").

24.     A "perishable agricultural commodity" is any fresh fruit or vegetable, whether or not frozen or packed in ice, including cherries in brine, as defined by the USDA Secretary. 7 U.S.C. § 499a(b)(4). The PACA regulations define fresh fruits and vegetables as "all produce in fresh form generally considered as perishable fruits and vegetables, whether or not packed in ice or held in common or cold storage, . . . [except] those perishable fruits and vegetables which have been manufactured into articles of food of a different kind or character." 7 C.F.R. § 46.2(u).

25.     Under the PACA, a "person" includes "individuals, partnerships, corporations, and associations." *Id*. at § 499a(b)(1).

26.     The PACA prohibits certain types of conduct on the part of commission merchants, dealers, and brokers. For example, it is unlawful for a commission merchant, dealer, or broker "to engage in or use any unfair, unreasonable, discriminatory, or deceptive practice in connection with the weighing, counting, or in any way determining the quantity of any perishable agricultural commodity received, bought, sold, shipped, or handled . . . ." *Id*. at § 499b(1).

27.     It is also unlawful under PACA for a commission merchant, dealer, or broker "to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity"; "to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction"; and "to fail or refuse truly and correctly to account and make full payment promptly" with respect to any transaction. *Id*. at 499b(4). A full listing of the conduct that a commission merchant, dealer, or broker is prohibited from engaging in is set forth at 7 U.S.C. § 499b.

28.     A commission merchant, dealer, or broker that violates any of the unfair conduct provisions "shall be liable to the person or persons injured thereby for the full amount of damages . . . sustained in consequence of such violation." *Id*. at § 499e(a). The injured person or persons may enforce such liability by bringing an action in federal district court or by filing a reparations proceeding before the USDA PACA branch against the commission merchant, dealer, or broker.

29.     The PACA requires that all commission merchants, dealers, and brokers obtain a valid and effective license from the USDA Secretary. The PACA sets forth several requirements and conditions associated with the licensing requirement including, but not limited to, standards governing the application for a license and the required fees; grounds on which the Secretary may refuse to issue a license; and the authority of the Secretary to withhold the issuance of a license pending an investigation of the applicant.

30.     A commission merchant, dealer, or broker that fails to obtain a valid and effective license "shall be liable to a penalty of not more than $1,000 for each such offense and not more than $250 for each day it continues . . . ." *Id*. at § 499c(a).

31.     If the USDA Secretary determines a commission merchant, dealer, or broker has violated any of the unfair conduct provisions, it may suspend the violator's license "for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender." *Id*. at § 499h(a).

### III.     PARTIES.

*A.     Plaintiffs.*

32.     Moore Family Farms is a Texas general partnership with its principal place of business located in Dalhart, Dallam County, Texas. The sole proprietor is David Moore, who is a resident and citizen of the State of Texas.

33.     Terry Lusk, Jason Lusk and Justin Lusk d/b/a JTJ Farms, a Texas general partnership, with its principal place of business located in Dalhart, Dallam County, Texas. The principals of JTJ Farms are all residents and citizens of the State of Texas.

34. Kevin Rentz, Amanda Calhoun Rentz, Dennis Bruce Rentz and Karla Jo Rentz d/b/ Rentz Family Farms ("Rentz") is a Georgia general partnership with its principal place of business located in Brinson, Decatur County, Georgia

35. Kevin L. Coggins d/b/a MEK Farms ("Coggins") is a Georgia sole proprietorship with his principal offices in Lake Park, Georgia, reporting as its member, Kevin Coggins, who is a resident and citizen of the State of Georgia.

36. Bowles Farming Company Inc. ("Bowles") is a California corporation with its principal place of business in Los Banos, Merced County, California.

37. Agropecuario Los Americanos S.A. de R.L. de C.V. ("Americanos") is a Mexican corporation with its principal offices in Hermosillo, Sonora, Mexico.

38. Phil Sandifer & Sons Farms, LLC ("Sandifer") is a South Carolina Limited Liability Company with principal offices in Blackwell, South Carolina. The members of Sandifer are residents and citizens of the State of South Carolina.

39. JMB Farm, LLC ("JBM") is an Indiana Limited Liability Company with its principal offices in Vincennes, Indiana. The members of JMB are residents and citizens of the State of Indiana.

40. Powe Farms Management LLC ("Powe") is a Georgia Limited Liability Company with its principal offices in Cairo, Georgia. The members of Powe are residents and citizens of the State of Georgia.

41. CA Comerical, S.A.C., ("CA") is a Peruvian corporation with principal offices in Lima, Peru.

42. Global Fresh S.A.C. ("Global") is a Peruvian corporation with principal

offices in Lima, Peru.

43.    Pepas Tropicales, S.A.C. .("Pepas"), is a Peruvian corporation with principal offices in Lima, Peru.

**B.    Defendants.**

### C.H. Robinson Worldwide, Inc.

44.    CHR Worldwide is a publicly traded Delaware corporation with its principal place of business in Eden Prairie, Minnesota.

45.    CHR Worldwide's predecessor was founded in 1905 and engaged in sourcing services of buying, selling, and marketing of fresh fruits, vegetables, and other perishable items.

46.    At all times relevant to this Complaint, CHR Worldwide is engaged in the business of buying, selling, and delivering wholesale quantities of fresh fruits and vegetables nationwide.

47.    At all times relevant to this Complaint, CHR Worldwide sells on credit and through interstate commerce, wholesale quantities of perishable agricultural commodities to its customers include which include, but are not necessarily limited to, grocery retailers, restaurants, foodservice distributors, and produce wholesalers.

48.    At all times relevant to this Complaint, CHR Worldwide is an unpaid creditor, supplier, and seller of perishable agricultural commodities as defined under PACA.

49.    At all times relevant to this Complaint, CHR Worldwide did not hold a federal produce license from the U.S. Department of Agriculture/PACA Branch.

50.     At all times relevant to this Complaint, CHR Worldwide did not hold a produce license as required by the State of California.

51.     At all times relevant to this Complaint, CHR Worldwide did not hold a produce license as required by the State of Georgia.

52.     At all times relevant to this Complaint, CHR Worldwide did not hold a produce license as required by the State of Texas.

53.     At all times relevant to this Complaint, CHR Worldwide did not hold a produce license as required by any of the United States.

54.     In 2014, CHR Worldwide created a new global business brand named Robinson Fresh® which exclusively provides sourcing services of buying, selling, and marketing of fresh fruits, vegetables, and other perishable items to growers, grocery retailers, restaurants, foodservice distributors, and produce wholesalers.

55.     Robinson Fresh is a trade name CHR Worldwide uses to separate its transportation and logistics business identity from its business of sourcing services of buying, selling, and marketing of fresh fruits, vegetables, and other perishable items to growers, grocery retailers, restaurants, foodservice distributors, and produce wholesalers.

56.     Robinson Fresh is a division of CHR Worldwide.

57.     Robinson Fresh is a trade name of CHR Worldwide.

58.     Robinson Fresh is a trademarked name owned by CHR Worldwide.

59.     MelonUp! is a trademarked name owned by CHR Worldwide.

60.     MelonUp! Logos are trademarked property owned by CHR Worldwide.

61.     Robinson Fresh is not a trade name of CHR Company.

62.     Robinson Fresh is not a trade name of CHR Inc.

63.     CHR Inc. is not a trade name of CHR Worldwide.

64.     At all times relevant to this complaint, Plaintiffs engaged in business with "Robinson Fresh."

### *C.H. Robinson Company*

65.     CHR Company is a Delaware corporation and a wholly-owned subsidiary of CHR Worldwide.

66.     CHR Company maintains its principal place of business in Eden Prairie, Minnesota.

67.     CHR Company maintains its principal place of business in the same office as CHR Worldwide.

68.     CHR Company is a separate corporate entity from Defendants CHR Worldwide and CHR Inc.

69.     CHR Worldwide has assumed all contractual liabilities and rights of CHR Company.

70.     CHR Inc. is not a trade name of CHR Company.

71.     CHR Company is not a trade name of CHR Inc.

72.     At all times relevant to this Complaint, CHR Company did not hold a federal produce license from the U.S. Department of Agriculture/PACA Branch.

73.     At all times relevant to this Complaint, CHR Company did not hold a produce license as required by the State of California.

74.     At all times relevant to this Complaint, CHR Company did not hold a produce license as required by the State of California.

### *C.H. Robinson Company, Inc.*

75.     CHR Inc. is a Delaware corporation and a wholly-owned subsidiary of CHR Worldwide.

76.     CHR Inc. maintains its principal place of business in Eden Prairie, Minnesota.

77.     CHR Inc. maintains its principal place of business in the same office as CHR Worldwide.

78.     CHR Inc. is a separate corporate entity from Defendants CHR Worldwide and CHR Company.

79.     To the extent any person actually works for CHR Inc., or on its behalf, those persons are actually employees of, and paid by, CHR Worldwide.

80.     CHR Worldwide has assumed all contractual liabilities and rights of CHR Inc.

81.     CHR Inc. is not a trade name of CHR Company.

82.     CHR Company is not a trade name of CHR Inc.

83.     At all times relevant to this Complaint, CHR Company did not hold a federal produce license from the U.S. Department of Agriculture/PACA Branch.

84.     At all times relevant to this Complaint, CHR Inc. did not hold a produce license as required by the State of Texas.

## IV. JURISDICTION AND VENUE.

85. The Court has subject matter jurisdiction under 7 U.S.C. § 499e(5) as this is an action by trust beneficiaries to enforce payment from the trust arising under PACA.

86. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 with respect to Plaintiffs' claims arising under federal law.

87. This Court has subject matter jurisdiction with respect to Plaintiffs' claims arising under state law based on:

> 87.01. diversity under 28 U.S.C. § 1332 because none of the Plaintiffs are citizens of the state in which Defendants are citizens and the amount in controversy, excluding of interest and costs, exceeds $75,000.00, and

> 87.02. supplemental jurisdiction under 28 U.S.C. § 1367.

88. Venue is proper in this district under 28 U.S.C. § 1391 due to the contractual venue provision contained in Defendants' contracts with each Plaintiff and because each Defendant resides within this jurisdiction.

## V. ALLEGATIONS OF FACT

### A. *The Common Contractual Terms Between Each Plaintiff and Defendants.*

89. At all times relevant to this complaint, each Plaintiff entered into certain written contracts exclusively with "C.H. Robinson Company d/b/a Robinson Fresh" (collectively referred to as the "Agreements"). The Agreements are collectively attached hereto as *Exhibits 1 through 12.*

90. In the Agreements, each Plaintiff agreed to exclusively grow and harvest various types of produce for Robinson Fresh who agreed to act as the exclusive

marketing agent on a consignment basis for the produce provided by each Plaintiff.

91.    The Agreements share these common characteristics:

91.01.    Each Plaintiff authorized Robinson Fresh to act as its agent with respect to produce consigned to Robinson Fresh.

91.02.    Title and risk of loss on the produce supplied by the Plaintiffs to Robinson Fresh remained with the Plaintiffs until final purchase and acceptance by a customer.

91.03.    Each Plaintiff continued to have rights with respect to consigned produce under Minnesota, PACA, and various other states.

91.04.    Additionally, each Plaintiff continued to have rights with respect to the consigned produce and rights under their respective Agreements after physical control of the produce was surrendered to a transportation provider.

91.05.    While Robinson Fresh could negotiate prices with final purchasers, Robinson Fresh assumed a fiduciary duty to each Plaintiff to truly and correctly account for all produce received and to accurately account to Plaintiffs for such sale, including specific sales price, expenses incurred and commissions.

91.06.    Plaintiffs retained the right to demand inspections and to be notified of final receiver condition or quality problems. If a final customer rejected a load of consigned produce, Plaintiffs retained the right to retake possession of the produce. Plaintiffs retained the right to terminate the Agreements

with Robinson Fresh, some Agreements were subject to an annual right of termination by either the Plaintiffs or Robinson Fresh.

91.07. At the time each Plaintiff provided produce to the transportation carrier, the produce was packed for final sale by the purchaser, no further manufacturing or processing was required.

92. Pursuant to the Agreements, each Plaintiff was required to plant an agreed-upon amount of produce. In some but not all cases, Robinson Fresh supplied a planting schedule which was to be followed.

93. Plaintiffs complied with their obligations under the Agreements to grow and pack the agreed upon produce.

94. In the Agreements, Robinson Fresh agreed to report the true sales price for all of Plaintiffs' consigned produce and to take its sole profit, its sales commission, from the commissions generated by the sales of produce.

95. Robinson Fresh received the produce supplied by each Plaintiff at a shipping point and sold such consigned produce for the benefit of Plaintiffs and provided additional goods and services to Plaintiffs in connection with the Agreements, such as financing before and during the production season.

96. The corporate predecessor of CHR Worldwide started in North Dakota in 1905 as a produce dealer. Over time, CHR Worldwide not only developed a nationwide produce distribution business but evolved into and became better known as a company that only provides logistical services to businesses.

97.     CHR Worldwide does not own any trucks or other transportation means, but rather seeks third-party transportation providers to ship produce by means of subcontracts with such providers. In the case of land transportation, CHR Worldwide arranges third-party truckers though its online portal Navisphere or the predecessor to Navisphere, Compass.

98.     Buyers of produce require transportation of the produce from Plaintiffs' facilities to their final destinations at the buyers' designated delivery point. Robinson Fresh either separately billed the customers for these freight charges or such freight charges were included with product cost in a single delivered sale invoice. Only in a few cases did purchasers of Plaintiffs' produce arrange their own transportation, in which case CHR Worldwide had no involvement in the transportation side of the sale of Plaintiffs produce.

99.     By the end of 2018, according to CHR Worldwide's SEC filings, Robinson Fresh represented approximately 4% of CHR Worldwide's total net revenues. But even within the Robinson Fresh division, transportation logistics has overcome produce distribution as a source of profits.

**B.      *The Defendants Maintain Two Set of Books—One is Secret.***

100.    Robinson Fresh maintains consignment produce sales and expense records within standard produce accounting software known as "Famous." This software generates consignment grower accountings that are provided to growers.

101.    The Famous system is readily auditable by the United States Department of Agriculture's PACA division.

102. However, for freight revenues and expenses that Robinson Fresh received and incurred, it maintained a system separate and apart from Famous. This system is known as the Navisphere accounting system, or its predecessor Compass.

103. Accountings of freight costs and revenues in Navisphere or Compass are not provided to consignment growers like the Plaintiffs even though these freight revenues and expenses are generated from the sales of the respective growers' produce.

104. CHR Worldwide's freight revenues from each shipment of Plaintiffs' produce resulted directly from each Plaintiff consigning such produce to Robinson Fresh.

## C. *Robinson Fresh's "Standard of Conduct" for Produce Suppliers.*

105. Robinson Fresh has a standard of conduct for its suppliers, including produce suppliers, such as Plaintiffs. The standard for suppliers, the Robinson Fresh Global Supplier Code of Conduct, is found online at:

> https://www.robinsonfresh.com/en-US/-
> /media/RobinsonFresh/grower%20supplier%20docum
> ents/English/Robinson%20Fresh%20Global%20Suppli
> er%20Code%20of%20Conduct%20V1117.pdf

106. The Robinson Fresh Global Supplier Code of Conduct, at ¶12, provides:

> Robinson Fresh Growers/Suppliers must maintain accurate financial books and business records in accordance with all applicable legal and regulatory requirements and accepted accounting practices.

## D. *CHR Worldwide's "Standard of Conduct" for Its Employees.*

107. CHR Worldwide's Corporate Secretary and Chief Legal Officer, Benjamin Campbell, published an Employee Code of Ethics on behalf of CHR Worldwide and its subsidiaries such CHR Company and CHR Inc., which can be accessed online at:

https://investor.chrobinson.com/Governance/Governance-Documents/default.aspx

Mr. Campbell states in his preamble to the Code of Ethics,

page 3:

> To be successful as an organization we expect everyone from the top down to adhere to the principles in the Corporate Compliance program to gain and keep the confidence and support of customer, regulatory agencies, the public and our employees.
>
> ….
>
> <u>Thank you in advance for your continued commitment to the *highest standards of business ethics* and for keeping the passion for success alive at C.H. Robinson. (emphasis added)</u>

108. The Employee Code of Ethics includes these statements:

> Accurate and reliable corporate financial records shall be maintained at all times. All funds and other assets and all transactions for C.H. Robinson must be reflected in full detail and promptly recorded in the appropriate C.H. Robinson books. Accepted accounting principles must be used for all recording.
>
> C.H. Robinson financial records must reflect an accurate and verifiable record of all transactions. *Information that you record and submit to another party, whether that party is inside or outside C.H. Robinson, must be accurate, timely, and complete.* You must not use any report or record to mislead those who receive them or to conceal anything that is improper. ….
>
> For purposes of this policy, financial records include all information pertaining to financial transactions which are executed on C.H. Robinson's behalf, including the proper recording of all transactions, records received and kept in

C.H. Robinson's files related to financial transactions and all information recorded in the accounting records and financial statements of C.H. Robinson.

Some examples are:
☐ Time reports
☐ Employee expense account records
☐ Invoices received by C.H. Robinson
☐ Invoices issued by C.H. Robinson
☐ Recordings in the general ledger
☐ Accounting journal entries
☐ Contracts
☐ E-mails relating to transactions
☐ *Transactions include all payments of money, transfers of property, and furnishing of services.*

All records and information must truthfully and in reasonable detail reflect the substance of the transaction. There is no materiality standard. All transactions must be recorded correctly regardless of amount. Examples of violations include:

> *Records that fail to record improper transactions;*
> *Records that are falsified to disguise aspects of improper transactions that were otherwise recorded correctly;*
> Records that correctly set forth the quantitative aspects of the transaction but fail to record the qualitative aspects that would have revealed their illegality or impropriety.
> (emphasis added)

### E. CHR Worldwide's Own Double Standard.

109. CHR Worldwide's strict standards of conduct for its suppliers as stated in the Robinson Fresh Global Supplier "Code of Conduct" and the standards for its employees as stated in its "Code of Ethics" stand in stark contrast to the actual deception and deceit with which it treated and continues to treat the Plaintiffs and similarly situated

Growers they seek to represent in this action, federal, state, and local courts and government agencies (including the USDA and SEC), generations of family-owned farms, and small, large, locally owned and businesses including grocers, retailers, wholesalers, restaurants—along with those businesses' customers—all of whom are situated throughout the United States and its territories.

110. Despite CHR Worldwide's employee Code of Ethics standard that "[i]nformation that [CHR Worldwide employees] record and submit to another party, whether that party is inside or outside C.H. Robinson, must be accurate, timely, and complete," the consignment accountings provided to the Plaintiffs were neither accurate nor complete.

111. Despite the CHR Worldwide Code of Ethics requirement barring "records that fail to record improper transactions' and records that are falsified to disguise aspects of improper transactions that were otherwise recorded correctly," Robinson Fresh sent the Plaintiffs consignment accountings that failed to record improper transactions and disguised aspects of improper transactions that were otherwise correctly recorded.

112. Despite CHR Worldwide's "commitment to the highest standards of business ethics", Robinson Fresh's consignment accountings to the Plaintiffs were false, deceptive, incomplete, misleading, and rendered in a manner to cover up CHR Worldwide's secret profits it was making at the expense of the Plaintiffs and other consignment growers as well as unauthorized and undisclosed expenditures.

113. Although Robinson Fresh's sole compensation for services provided under the Agreements was to be its sales commission of the true FOB price, it engaged in

conduct to receive additional revenue that belonged to Plaintiffs and other growers and failed to disclose and seek authorization for expenditure of Plaintiffs' proceeds of sale.

114. Robinson Fresh never disclosed, and Plaintiffs did not consent to, its following practices:

114.01. Robinson Fresh engaged in a process of structuring the transportation of consigned produce supplied by Plaintiffs and other growers in a manner that would place additional revenue in its coffers rather than to Plaintiffs ("freight topping").

114.02. In addition, Robinson Fresh contracted for an additional reduction of 2% of freight charges made by carriers and retained that reduction for itself and did not pass the savings on to Plaintiffs.

114.03. Robinson Fresh secretly received a profit increment by receipt of secret rebates from seed suppliers from whom growers purchased seeds. These rebates were paid from the funds that growers, such as Plaintiffs, paid to the seed company for the seeds used to produce crops consigned to Robinson Fresh.

114.04. Robinson Fresh secretly received rebates of fees paid by Plaintiffs and other growers paid to pallet rental companies under a contract with CHEP USA. The rebates were paid from funds that growers, such as Plaintiffs, paid to CHEP USA for pallets used in the transportation of the produce consigned to Robinson Fresh.

114.05.    On information and belief, Robinson Fresh received rebates from other third-party suppliers based upon payments made by Plaintiffs to these third-party suppliers of goods and services in connection with the produce consigned to Robinson Fresh by Plaintiffs.

114.06.    Robinson Fresh paid undisclosed and unauthorized promotional rebates, expenses and allowances to purchasers of produce supplied by one or more of the Plaintiffs.

114.07.    Robinson Fresh added false and undisclosed charges to Plaintiffs and other Growers for packing, labeling, and other items which it used to pay for its "donations" breast cancer organizations.

## F.    *Freight Topping—How it Works.*

115.    Produce consigned to Robinson Fresh must be shipped from the Plaintiffs' facilities to ultimate customers, such as chain stores, other retailers and wholesalers.

116.    In a few instances, Robinson Fresh's customers provide their own trucks and the produce sold by Robinson Fresh and loaded by Plaintiffs would be transported to the customer. In these few instances, Robinson Fresh did not make a hidden, unauthorized, additional profit on freight.

117.    However, in the instances in which customers did not arrange for their own transportation of produce from Plaintiffs' facilities by means of a non-Robinson Fresh contracted freight carrier, Robinson Fresh obtained additional undisclosed net revenue from the consignment agreement with Plaintiffs, over and above the agreed commission collected by it.

## G. *Additional Freight Revenues Incorporated into the Invoice Price.*

118.    To obtain additional revenues from produce sales in those instances when customers did not provide their own transportation, Robinson Fresh relied upon two principal means to make additional, undisclosed and unauthorized profit on Plaintiffs' consigned produce.

119.    In some instances, Robinson Fresh sold Plaintiffs' produce to customers at a price that included the cost of transportation within the sales price, a sale made on a delivered price basis.

120.    In the instances described above, Robinson Fresh assigned a portion of the delivered price of the sale to the freight component of the sale and another portion to the cost of the product the total of which was contained in a single customer invoice. Only the portion of revenue allocated by Robinson Fresh to produce cost was reported to Plaintiffs and other growers through CHR Worldwide's Famous software. As a result, Plaintiffs had no way of knowing that Robinson Fresh was making secret freight profits in these instances.

121.    Robinson Fresh's allocation of the customer delivered invoiced amount between freight and product components as above resulted in additional profit to Robinson Fresh between the actual cost of the transport charged by the trucker and the amount Robinson Fresh allocated to the cost. This secret profit was only accounted for in Navisphere or Compass accounting systems and was not auditable by the USDA's PACA branch in the case of a regulatory audit of CHR Inc. by the USDA.

122.   The amounts assigned to freight by Robinson Fresh as described above were inconsistent.

123.   In a very few instances, freight charges from the third-party truckers was more than what Robinson Fresh used to calculate an FOB price to growers.

124.   In other instances, unauthorized freight profits exceeded $1,000 per load of produce.

125.   Robinson Fresh had an economic incentive to self-deal at the expense of its growers such as Plaintiffs. If Robinson Fresh had merely passed through the cost of transportation without a hidden, unauthorized transportation profit, it would have received only the agreed upon percentage of the true sales price as commissions—the same as its honest competitors—the remainder of the customer purchase price above the charge by the trucker would be proceeds payable to the grower, such as Plaintiffs.

126.   By allocating additional revenue on a customer sale to transportation over and above what was charged by the transportation supplier, Robinson Fresh retained for itself all the additional undisclosed revenue over and above the true transportation cost instead of limiting itself to the contractually agreed sales commissions.

**H.   *Additional Freight Revenues by Means of Separate Freight Contracts Between Robinson Fresh and Produce Purchasers.***

127.   The other means by which Robinson Fresh made secret, self-dealing profits on transportation of Plaintiffs' produce was by means of direct freight contracts with purchasers of product consigned to Robinson Fresh by Plaintiffs.

128. Robinson Fresh negotiated seasonal freight contracts with certain customers by which it agreed to set freight rates between a shipping point and the customers' desired delivery destination. Any profits representing the difference between Robinson Fresh's seasonal freight price under such freight contracts and the charge made by the transportation provider to Robinson Fresh were appropriated by CHR Worldwide. But for the shipments of produce consigned by Plaintiffs to Robinson Fresh, CHR Worldwide would not have received an additional increment of revenue arising from their shipment of Plaintiffs' consigned produce under these separate freight contracts.

## I. *Additional Secret Freight Rebates.*

129. In addition to the freight topping practices described above, Robinson Fresh also received the financial benefit of a secret 2% prompt payment discount on freight charges from transportation providers through its transportation agreements. Robinson Fresh did not return these discounts to the growers, but rather pocketed this undisclosed revenue for itself.

130. While Robinson Fresh charged the final customer for the gross freight amount or included the gross amount of the freight in the delivered billing of Plaintiffs' produce, the actual amount paid to the trucker was 2% less.

131. Robinson Fresh did not remit the secret discount taken from Plaintiffs. The retention of this prompt payment discount resulted in additional undisclosed and unauthorized profits for CHR Worldwide

*J.    **Additional Secret Rebates on Other Expenses Paid by Plaintiffs and Secret
Payments of Promotional Rebates, Expenses and Allowances.***

132.    At some point in 2015 or 2016 a group of growers who were supplying

watermelons to Robinson Fresh, including JMB, attended a meeting with Robinson Fresh

representatives to discuss how it might assist these growers in lowering third party costs,

such as pallet rentals. These growers requested Robinson Fresh's assistance in obtaining

lower charges from these third-party vendors whose services and products were used by

these growers to supply Robinson Fresh.

133.    Robinson Fresh never told these growers it had negotiated *for itself* secret

rebates of payments made by Plaintiffs and other consignees to other third-party goods

and service providers such as seed suppliers, CHEP USA, a pallet rental supplier and

other third-party providers.

134.    CHR Worldwide employees were required to provide a person within its

structure, Joanne Dalton, the name of any new produce supplier in order that this person

would contact third-parties with which Robinson Fresh had negotiated these secret rebate

agreements. These contacts with third parties were made in order that the third-party

supplier would rebate a portion of what the new grower had paid the third party.

135.    Robinson Fresh never told the Plaintiffs and other growers that it was

receiving backdoor payments from third-party vendors and it failed to remit such

payments to Plaintiffs or other consignment growers.

136.    Robinson Fresh also paid undisclosed and unauthorized promotional

rebates, expenses and allowances to purchasers of produce supplied by the Plaintiffs.

## K. What Defendants Were Required To Do And What They Actually Did.

137. Robinson Fresh was required by its contracts and by applicable federal and state law to truly and accurately account to all growers, including Plaintiffs, for all produce received on consignment.

138. Although Robinson Fresh requires its growers, and CHR Worldwide employees to keep accurate books of all dealings with and within CHR Worldwide, it did not apply the same standard to its own conduct.

139. Robinson Fresh only provided its growers with false or incomplete accountings of produce sales prepared in Famous.

140. Accountings of freight profits earned by Robinson Fresh, reported on the secret second set of books, were only reported in Navisphere or Compass never reported to Plaintiffs.

141. An USDA auditor auditing Robinson Fresh's Famous produce accounting software would likewise be unaware of its secret freight profits because these profits were not recorded in the Famous software.

142. The reports Robinson Fresh sent Plaintiffs by means of interstate communications were materially false because freight charges were inaccurately accounted for resulting in secret, unauthorized profits on freights of produce and on secret 2% freight price reductions from truckers.

143. Under both state and federal law, these additional revenues should have been accounted by Robinson Fresh to Plaintiffs and paid to Plaintiffs.

144.    The rebates, promotional allowances and expenses described above were unauthorized by and undisclosed to Plaintiffs and, therefore, were improperly deducted from the sales returns provided to Plaintiffs.

145.    In its 2018 10-K filing with the United States Securities Exchange Commission ("SEC"), page 4, Defendant CHRW states as follows:

> Transportation and Logistics Services
>
> CHRW provides freight transportation and related logistics and supply chain services. Our services range from commitments on a specific shipment to much more comprehensive and integrated relationships. We execute these service commitments by investing in and retaining talented employees, developing cutting edge proprietary systems and processes, and utilizing a network of contracted transportation providers, including, but not limited to, contract motor carriers, railroads, and air and ocean carriers. We make a profit on the difference between what we charge to our customers for the totality of services provided to them and what we pay to the transportation providers to handle or transport the freight. While industry definitions vary, given our extensive contracting to create a flexible network of solutions, we are generally referred to in the industry as a third-party logistics company.
>
> We provide the following transportation and logistics services:
>
> - Truckload: Through our contracts with motor carriers, we have access to dry vans, temperature-controlled vans, flatbeds, and bulk capacity. We connect our customers with carriers who specialize in their transportation lanes and product types, and we help carriers optimize the usage of their equipment.

- Less than Truckload: ("LTL") transportation involves the shipment of single or multiple pallets of freight. We focus on shipments of a single pallet or larger, although we handle any size shipment. Through our contracts with motor carriers and use of Navisphere, we consolidate freight and freight information to provide our customers with a single source of information on their freight. In many instances, we will consolidate partial shipments for several customers into full truckloads.

146.     CHR Worldwide changed its financial reporting of freight revenues within the Robinson Fresh division in its mandatory filings with the SEC commencing with its 8-Q report on May 1, 2019.

147.     CHR Worldwide stated in its 8-Q that it would no longer separately report freight revenues for Robinson Fresh as part of its required SEC filings.

148.     Allegations of CHR Worldwide's practices of making additional profits on freights on consignment transactions were first made public in an amendment in a suit against Defendants in 2019.

149.     Prior to that date, Robinson Fresh did not inform consignment produce growers that it made additional revenue from the differential between actual freight charges by truckers on grower consignment transactions and the amount charged to final customers for such freight and as a result did not reveal the amounts of such revenues received.

150.     Despite having direct knowledge of its wrongdoing, Defendant continue to provide consignment accountings that do not disclose the true net revenues with proper accounting of freight and other third-party costs.

151.    CHR Worldwide employees within the Robinson Fresh division were aware of the accounting practices described above, but they did nothing to correct it.

152.    A CHR Worldwide employee raised the issue of the propriety of these practices of making additional undisclosed revenue on its transportation of consigned produce loads to CHR Worldwide's management in 2017, but he was told CHR Worldwide was not "going to open that can of worms."

153.    CHR Worldwide relies upon a datamining software system, Cognos, which readily allows it to determine the amount of additional profit earned from freight topping.

154.    The Defendants did not account to or pay Plaintiffs the additional undisclosed profits they earned from transportation provided by third-party carriers for delivery of Plaintiffs' produce on consignment.

155.    Plaintiffs were repeatedly informed by CHR Worldwide representatives that Robinson Fresh's company policy was to not use trucks to transport consignment shipments of consigned produce to ultimate customers unless the trucks were obtained by Robinson Fresh. The sole exception to this policy was when a customer insisted on selecting its own carrier for its purchased load.

156.    Robinson Fresh's dual capacity as a fiduciary consignment sales agent for the Plaintiffs, as well as effectively being the party who sought third-party transportation services for product being handled by CHR Worldwide under the Agreements created an inherent conflict of interest.

# VI.    CLASS ALLEGATIONS

157.    Plaintiffs bring this action individually and as a class action on behalf of all

other persons similarly situated pursuant to Fed. R. Civ. P. 23.

158.    Subject to discovery and further investigation which may cause Plaintiffs to

modify the class definition to be more inclusive or less inclusive, Plaintiffs define the

"Class" as:

> All persons who entered into a consignment contract
> with "C.H. Robinson Company d/b/a Robinson Fresh"
> for growing, harvesting, cooling, packing, transporting,
> marketing, and selling of fresh grown fruits and
> vegetables.

159.    Subject to discovery and further investigation which may cause Plaintiffs to

modify the definition of the "Class Claims" to be more inclusive or less inclusive,

Plaintiffs define the Class Claims as:

> Any and all claims arising out of a class member's
> contract with Defendants for growing, harvesting,
> cooling, packing, transporting, marketing, and selling of
> fresh grown fruits and vegetables.

160.    Subject to discovery and further investigation which may cause Plaintiffs to

modify the class definition to be more inclusive or less inclusive, Plaintiffs define a

"California Sub-Class" as:

> All persons in the State of California who entered into a
> consignment contract with "C.H. Robinson Company
> d/b/a Robinson Fresh" for growing, harvesting, cooling,
> packing, transporting, marketing, and selling of fresh
> grown fruits and vegetables.

161.     Subject to discovery and further investigation which may cause Plaintiffs to modify the definition of the "California Sub-Class Claims" to be more inclusive or less inclusive, Plaintiffs define the California Sub-Class Claims as:

> Any and all claims arising out of a class member's contract with Defendants for growing, harvesting, cooling, packing, transporting, marketing, and selling of fresh grown fruits and vegetables.

162.     Subject to discovery and further investigation which may cause Plaintiffs to modify the class definition to be more inclusive or less inclusive, Plaintiffs define a "Georgia Sub-Class" as:

> All persons in the State of Georgia who entered into a consignment contract with "C.H. Robinson Company d/b/a Robinson Fresh" for growing, harvesting, cooling, packing, transporting, marketing, and selling of fresh grown fruits and vegetables.

163.     Subject to discovery and further investigation which may cause Plaintiffs to modify the definition of the "Georgia Sub-Class Claims" to be more inclusive or less inclusive, Plaintiffs define the Georgia Sub-Class Claims as:

> Any and all claims arising out of a class member's contract with Defendants for growing, harvesting, cooling, packing, transporting, marketing, and selling of fresh grown fruits and vegetables.

164.     Based on discovery and further investigation, Plaintiffs may, in addition to moving for class certification using modified definitions of the Class and Class Claims, California Sub-Class and California Sub-Class Claims, and  Georgia Sub-Class and Georgia Sub-Class Claims seek class certification only as to particular issues as permitted under Fed. R. Civ. P. 23(c)(4).

165. The identity of each member of the Class, California Sub-Class, and Georgia Sub-Class is readily ascertainable from Defendants' records.

166. This action has been brought, and may properly be maintained, as a class action pursuant to the provisions of Fed. R. Civ. P. 23(a) because there is a well-defined community interest in the litigation in that:

167. *Numerosity.* Plaintiffs are informed and believe, and on that basis allege, that the members of the Class, California Sub-Class, and Georgia Sub-Class are so numerous that joinder of all members would be impractical.

168. On information and belief, there are at least 40 members of the Class.

169. On information and belief, there are at least 40 members of the California Sub-Class.

170. On information and belief, there are at least 40 members of the Georgia Sub-Class.

171. *Commonality.* Common questions of law and fact exist as to all members of the Class, California Sub-Class, and Georgia Sub-Class. The principal issues are: whether Defendants' conduct as described in the **Allegations of Fact** was the same or substantially similar with respect to members of the Class; and whether such conduct violated PACA and/or state law.

172. *Typicality.* Plaintiffs' claims are typical of the claims of the Class, California Sub-Class, and Georgia Sub-Class members. Plaintiffs and all members of the Class, California Sub-Class, and Georgia Sub-Class have claims arising out of Defendants' common and uniform course of conduct as set forth in **Allegations of Fact**.

173.    *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class, California Sub-Class, and Georgia Sub-Class members insofar as no Plaintiff has interests that are known or believed to be averse to the absent members of the Class, California Sub-Class, and Georgia Sub-Class. The Plaintiffs are committed to vigorously litigating this matter. Plaintiffs have also retained counsel experienced in handling complex legal issues and class actions. Plaintiffs and Plaintiffs' counsel have no interests which might cause them not to vigorously pursue the instant class action lawsuit.

174.    This action may be maintained as a "B1a-class", a "B2-class", a "B3-class", or a hybrid of any two or all three types however, at the time of commencing this action, Plaintiffs expect to seek certification of a class under Fed. R. Civ. P. 23(b)(3) because the questions of law and fact common to members of the Class, California Sub-Class, and Georgia Sub-Class predominate over any questions affecting an individual member, and a class action would be superior to other available methods for the fair and efficient adjudication of the controversy because individual joinder of all members would be impracticable, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum efficiently and without unnecessary duplication of effort and expense that individual actions would engender, an important public interest will be served by addressing the matter as a class action, substantial expenses to the litigants and to the judicial system will be realized, and difficulties are unlikely in the management of a class action.

## VII. FIRST CAUSE OF ACTION FOR BREACH OF EXPRESS AND IMPLIED DUTIES UNDER THE PERISHABLE AGRICULTURAL COMMODITIES ACT – FALSE EXPENSE ACCOUNTINGS DURING 2012 THROUGH 2018 SEASONS

175.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

176.    PACA expressly prohibits rendition of false or misleading accountings of produce received on consignment:

> It shall be unlawful in or in connection with any transaction in interstate or foreign commerce-
>
> (4) For any commission merchant, dealer, or broker to …. fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had….

177.    The term "commission merchant" is defined under §499a(b)(5) of PACA as any person engaged in the business of receiving …. any perishable agricultural commodity for sale, on commission, or for or on behalf of another."

178.    CHR Worldwide was a commission merchant with respect to the produce shipped to it on consignment by Plaintiffs.

179.    The term "growers' agent" is defined in PACA regulation 7 CFR 46.2(q) as "any person operating at a shipping point who sells or distributes produce in commerce for or on behalf of growers or others and whose operations may include the planting, harvesting, grading, packing and furnishing containers, supplies or other services."

180.    CHR Worldwide was a growers' agent with respect to the produce shipped to it on consignment by Plaintiffs.

181.    CHR Worldwide is required by PACA regulations, specifically 7 CFR

46.29(a) as a

> commission merchant and 46.32(b) as a grower's
> agent, to maintain a complete archive of all
> transactions, charges and sales related to each lot of
> produce received on consignment from all suppliers,
> including Plaintiffs. Additionally, CHRW is
> required to render a true and correct accounting of
> all transactions related to produce supplied on
> consignment by Plaintiffs.

182.    CHR Worldwide breached its duties owed to Plaintiffs under PACA and its

regulations by providing false and incomplete accountings to Plaintiffs under the

Agreements. Such accountings did not truly and correctly account for the results of

consignment sales and particularly did not accurately reflect the true freight cost, as well

as seed, pallet rental and other third-party rebates received.

183.    CHR Worldwide actively sought to prevent the discovery of the breach of

its duties under PACA regulations by providing Plaintiffs with only the false and

incomplete accountings created by Famous and by failing to make disclosure to Plaintiffs

and other consignment growers of the true freight costs and revenues recorded in

Navisphere and Compass and by not disclosing seed, pallet rental and other rebates

received from payments made by Plaintiffs to such third-party suppliers. The dual set of

books maintained by CHR Worldwide facilitated this practice.

184.    PACA, as well as the general Minnesota, California, and Georgia law of

agency, prohibit a sales agent from making profits from any third-party products or

services without the fully informed, express consent of the consignor.

185.   Consequently, CHR Worldwide's acts and omissions were knowingly made in direct violation of its duties under PACA and its regulations.

186.   In the Agreements, CHR Worldwide agreed to report the true sales price for all transactions of Plaintiffs' produce and to take its sole profit, a sales commission, strictly from its sales of produce.

187.   CHR Worldwide violated its express contractual duty by false and incomplete sales liquidation reports to Plaintiffs and by retaining secret undisclosed profits detailed herein.

188.   PACA contains a civil remedy for breaches of unfair conduct in 7 U.S.C. § 499e(a) and (b)(1).

189.   Due to the unfair conduct by CHR Worldwide and the other Defendants, both the express and implied duties created under PACA and its regulations, Plaintiffs have been damaged in an amount of the pallet rebates, the seed rebates, other third-party rebates, freight prompt payment discounts, and the difference between the freight actually paid by CHR Worldwide and the amounts final customers paid it for freight, promotional, and other rebates to buyers and seek an accounting and payment of such items.

## VIII.   SECOND CAUSE OF ACTION FOR BREACH OF CONTRACT BY MEANS OF FALSE EXPENSE ACCOUNTINGS DURING 2012 THROUGH 2018 SEASONS ALL PLAINTIFFS

190.   Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

191.   CHR Worldwide's freight topping, profits from undisclosed freight discounts and receipt of seed, pallet rental and other third-party rebates constitutes a

breach of the Agreements.

192. As a result of Defendants' breach of the Agreements by false accountings, Plaintiffs have been damaged in an amount in of the pallet rebates, the seed profits, other third-party supplier rebates, the prompt payment freight discounts and the difference between the freight actually paid by CHR Worldwide and the amounts final customers paid it for freight.

193. Minnesota law provides for recovery of damages, court costs, and attorneys' fees upon violation of the duty of good faith in agricultural contracts. Minn. Stat. Ann. § 17.94. In addition, some of the Agreements provide for an award of attorney's fees to the prevailing party in any suit under that agreement.

194. Plaintiffs seek recovery of damages due to Defendants' breach of implied duty of good faith, court costs, and attorney's fees.

195. Plaintiffs seek an accounting and recovery of damages due to Defendants' breach of contract in the amount of the pallet rebates, seed profits, and the difference between the freight actually paid by Defendants and the amounts final customers paid for freight, promotional, and other rebates, and expenses paid to buyers and attorneys' fees.

## IX. THIRD CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY – FALSE EXPENSE ACCOUNTINGS DURING 2012 THROUGH 2018 SEASONS – ALL PLAINTIFFS

196. Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

197. The Agreements contain multiple references to Robinson Fresh as an "agent."

198.     The Agreements are sales agency contracts and, for the reasons described above, CHR Worldwide is a sales agent under these agreements.

199.     PACA provides that sales agents owe their principals a fiduciary duty to place the principal's interest above that of the agent, to correctly account for their sales activities, revenues and expenses and more particularly to not make a secret, self-dealing profit from the subject matter of the agency.

200.     Consignment transactions under PACA are fiduciary transactions in which the consignee is required to exercise a high degree of care to protect the interests of the consignor. A consignee's duty under PACA to provide a consignor an accurate accounting is a fiduciary duty.  This fiduciary duty to accurately account under PACA Section 2, common to all consignor – consignee relationships, is distinct from the separate fiduciary duty created under the PACA trust, 7 U.S.C. §499e(c)

201.     Sales agents are also fiduciaries under Minnesota common law and the courts have stated that an agent stands in a fiduciary position with respect to its principal.

202.     The duty has been described as follows:

> One acting in a fiduciary capacity must exercise the utmost fidelity toward the principal, [citation omitted] and owes the principal a duty of full disclosure [citation omitted]. An agent cannot profit from the subject of the agency without the principal's consent, freely given after full disclosure of any facts that might influence the principal's judgment.

*Carlson v. Carlson*, 363 N.W.2d 803, 805 (Minn. Ct. App. 1985).

203.     Agency is defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf

and subject to his control, and consent by the other so to act."

204. CHR Worldwide was acting as an agent of the Plaintiffs because the Plaintiffs manifested consent that Robinson Fresh act as their exclusive sales agent in the Agreements and the Plaintiffs retained some elements of control over Robinson Fresh under the Agreements after their produce was placed on trucks at each shipping location.

205. Physical control of the produce shipped by the Plaintiffs to Robinson Fresh is not necessary for an agency relationship to arise.

206. The relationship between CHR Worldwide and Plaintiffs was that of agent and principal because:

206.01. The Agreements were actually drafted by CHR Worldwide and they state that both Title and Risk of Loss are to be retained by grower until acceptance by Robinson Fresh's customer, as applicable.

206.02. There was never an agreed upon price between Robinson Fresh and Plaintiffs. Robinson Fresh negotiates a final sales price with the ultimate buyer and charges a commission based on that price and the remaining amount must be remitted to Plaintiffs.

206.03. Robinson Fresh was required to report to Plaintiffs the final sales prices upon which its commissions were determined and paid.

206.04. Plaintiffs retained a limited right to demand inspections of produce for which customers had a complaint regarding quality or condition at delivery.

206.05.    The produce consigned to Robinson Fresh was delivered in a complete form. CHRW was not required to make any alteration.

206.06.    Plaintiffs retained the right to terminate the Agreements, in some cases, the Agreements were subject to an annual right of either party to terminate them.

206.07.    In the event of a rejection of a load by a final customer, the Plaintiffs retained the right to retake possession of their produce

207.    Under Minnesota Law, Robinson Fresh and Plaintiffs were acting under an agency relationship and Robinson Fresh was under a duty to act as a fiduciary to Plaintiffs.

208.    Robinson Fresh, as an exclusive sales agent for Plaintiffs, owed fiduciary duties under both Minnesota law and under PACA in connection with its receipt of produce on consignment. Such duties include the duty to not self-deal as part of the consignment sales agent process, unless it obtains the fully informed, express consent of the Plaintiffs.

209.    CHR Worldwide's freight topping, retention of the 2% rebates withheld from transportation providers, rebates on seed purchases and pallet rental and other third-party charges paid by Plaintiffs constitute breaches of the fiduciary duty owed to Plaintiffs under PACA and Minnesota common law.

210.    The dual set of books maintained by CHR Worldwide, Famous for produce consignment accounting and Navisphere or Compass for freight accounting, were utilized to carry out this breach of fiduciary duty.

211.    CHR Worldwide's double standard for financial reporting, demanding accuracy from growers and employees while knowingly taking secret, unauthorized profits from growers, is further evidence CHR Worldwide knows what it must do but chooses to do otherwise.

212.    A CHR Worldwide supervising employee, when asked about freight topping, told a CHR Worldwide employee that CHR Worldwide does not want to "open a can of worms" by correctly accounting to growers like Plaintiffs for freight charges.

213.    The sales reports provided to Plaintiffs contain only the fictitious sales prices, and a commission charged on the fictitious sales price.

214.    Nowhere do the Robinson Fresh sales reports provided to Plaintiffs reflect the substantial, secret, self-dealing profit that CHR Worldwide takes between the amount which it arbitrarily assigns to freight and the actual freight charged by the third-party freight provider or the seed, pallet rental and other third-party rebates.

215.    Such attempts to hide the true nature of its sales from growers such as Plaintiffs are a further breach of the fiduciary duty CHR Worldwide owed Plaintiffs as a sales agent and evidence that it knowingly and intentionally violated its duties under the law.

216.    A CHR Worldwide supervising employee conducted an internal audit of its freight topping of three growers other than Plaintiffs which revealed freight topping by CHR Worldwide for all three growers. This audit was done by means of CHR Worldwide's Cognos data mining software.

217.    The full extent of CHR Worldwide's freight topping of the consignment liquidations of Plaintiffs and other growers can be readily determined by use of Cognos data mining software.

218.    Plaintiffs have been damaged in an amount in of the pallet rebates, the seed rebates, undisclosed third-party rebates received and charged to Plaintiffs' accounts, undisclosed freight discounts and the difference between the freight actually paid by Robinson Fresh to freight providers and the amounts charged final customers paid it for freight and the prompt payment discounts received by CHR Worldwide and other rebates, expenses and promotional fees paid to buyers.

219.    Plaintiffs seek an accounting of all sales revenues, freight charges, freight discounts, seed rebates, pallet rental rebates and any other net revenues obtained by Defendants in addition to the agreed commissions received under the 2012 through 2019 Agreements.

220.    The Minnesota law of fiduciary relationships provides for forfeiture of commissions by an agent that violates its fiduciary duties under an agency relationship if the breach of fiduciary duty was material.

221.    The amounts wrongfully retained by CHR Worldwide for freight, seeds and pallet rental and other third-party rebates were material to Plaintiffs.

222.    The funds improperly retained by CHR Worldwide or improperly deducted were 100% profit for the Plaintiffs because the planting and harvest and sales expenses were previously paid by or on behalf of Plaintiffs and as a result these revenues would have been paid to Plaintiffs

223.    CHR Worldwide's substantial and intentional breach of its fiduciary duties owed to Plaintiffs by taking secret profits on freight transactions, seed, pallet rental and other third-party transactions on the sales of Plaintiffs' produce as well as the deduction of undisclosed and unauthorized rebates, expenses and promotional fees paid to buyers and donations related to the Pink Ribbon campaign make all sales commissions charged to Plaintiffs for produce sales during the years 2012 through 2018 subject to forfeiture.

224.    Plaintiffs seeks forfeiture of commissions received by CHRW.

## X.    FOURTH CAUSE OF ACTION FOR CIVIL THEFT

225.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

226.    Minnesota law provides a remedy for civil theft of personal property.

227.    CHR Worldwide's freight topping, retention of rebates from seed, pallet rental and other third-party suppliers to Plaintiffs and unauthorized and undisclosed payment of rebates, Pink Ribbon donations, and expenses and promotional fees to buyers constitute civil theft under Minnesota law

228.    Plaintiffs are entitled to return of all funds stolen by CHR Worldwide along with an award of additional damages up to the amount of personal property stolen.

## XI.    FIFTH CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

229.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

230.    Under Minnesota law, every contract includes an implied covenant of good

faith and fair dealing.

231. Minnesota law further provides for recovery of damages, court costs, and attorneys' fees upon violation of the duty of good faith in agricultural contracts. Minn. Stat. Ann. § 17.94.

232. The acts and omissions of CHR Worldwide and the other Defendants stated herein violated the implied covenant of good faith and fair dealing based upon the subject contract executed between the parties.

233. CHR Worldwide's acts and omissions which breached its implied duty of good faith and fair dealing include freight topping, retention of prompt payment discounts on freights, receipt and retention of seed, pallet rental and other third-party rebates and other rebates, expenses and promotional fees paid to buyers.

234. Plaintiffs seeks recovery of damages due to Defendants' breach of implied duty of good faith and fair dealing, court costs, and attorneys' fees.

## XII. SIXTH CAUSE OF ACTION – GEORGIA SUB-CLASS PLAINTIFFS - AGAINST CHR WORLDWIDE, CHR COMPANY, AND ROBINSON FRESH FOR ILLEGAL OPERATION OF A PRODUCE SALES ENTITY WITHIN THE STATE OF GEORGIA

235. Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

236. The State of Georgia maintains a special statutory scheme to protect its produce growers from sharp practices of produce merchants.

237. Under the Georgia Dealer in Agricultural Products law, Ga. Code Ann. § 2–9–2, produce merchants such as Robinson Fresh must hold a license issued by the

Georgia Commissioner of Agriculture.

238.     Georgia law requires licensed dealers to post a bond for the protection of Georgia growers.

239.     CHR Worldwide, CHR Company, and Robinson Fresh operate a facility near Omega, Georgia from which their employees work, sell, and contract with produce growers within the State of Georgia, including Plaintiffs, MEK Farms and Powe, and other similarly situated Growers.

240.     Georgia law contains a special provision to protect Georgia businesses who deal with unlicensed entities under Georgia law.

241.     The Georgia Legislature enacted the Dealer in Agricultural Products law to protect the public, particularly Georgia growers, rather than simply raise revenue.

242.     The Georgia Dealer in Agricultural Products law, particularly its bonding requirement, is solely intended to protect Georgia agricultural producers.

243.     The Georgia licensing law was enacted to protect the public and, therefore, an unlicensed entity's contract with a Georgia produce grower is void and unenforceable.

244.     All commissions CHR Worldwide, CHR Company, and Robinson Fresh charged MEK, Powe, and other similarly situated Georgia Growers under their contracts were illegal under Georgia law and, therefore, subject to disgorgement.

245.     MEK and Powe, individually and on behalf of the Georgia Sub-Class seeks damages equal to the commissions charged by CHR Worldwide, CHR Company, and Robinson Fresh.

## XIII. SEVENTH CAUSE OF ACTION - CALIFORNIA SUB-CLASS PLAINTIFFS - AGAINST CHR WORLDWIDE, CHR COMPANY, AND ROBINSON FRESH FOR ILLEGAL OPERATION OF A PRODUCE SALES ENTITY WITHIN THE STATE OF CALIFORNIA

246.     Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

247.     The State of California maintains a special statutory scheme to protect its produce growers from sharp practices by produce merchants.

248.     The California Produce Dealers Act ("Act"), Cal. Food & Agric. Code § 56181, mandates that produce merchants like CHR Worldwide who conduct business with produce growers in California hold a license issued by the California Department of Food and Agriculture.

249.     CHR Worldwide, CHR Company, and Robinson Fresh operate several facilities in the State of California from which their employees work, sell, and contract with California produce growers including Bowles and other similarly situated Growers.

250.     At all times relevant to this Complaint, neither CHR Worldwide, CHR Company, nor Robinson Fresh held a license issued by the California Department of Food and Agriculture.

251.     The contracts CHR Worldwide, CHR Company, and Robinson Fresh entered into with Bowles and other similarly situated California growers are void under California law because none of those entities held a license issued by the California Department of Food and Agriculture.

252.    All commissions CHR Worldwide, CHR Company, and Robinson Fresh charged Bowles and other similarly situated California under their contracts were illegal under California law and, therefore, subject to disgorgement.

253.    Bowles, individually and for the California Sub-Class, seeks damages equal to the commissions charged by CHR Worldwide, CHR Company, and Robinson Fresh.

## XIV.    CAUSES OF ACTION PERTAINING ONLY TO MOORE, RENTZ, COGGINS, BOWLES, AMERICANOS, SANDIFER, GLOBAL, PEPAS, POWE AND GC– MISHANDLING OF MARKETING OF MELONS AND ASPARAGUS

254.    Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

255.    Moore, Rentz, Coggins, Bowles, Americanos, Sandifer, Global, Powe, Pepas and GC (the "Marketing Practices Plaintiffs") entered into the Agreements with Robinson Fresh, described above.

256.    Pursuant to the Agreements, the Marketing Practices Group members were to exclusively produce seedless and mini watermelons or asparagus for Robinson Fresh which would act as exclusive marketing agent.

257.    The Agreements expressly prohibited the members of the Marketing Practices Plaintiffs from selling watermelons and asparagus grown under the Agreement to other parties. The years in controversy for the members of the Marketing Practices Plaintiffs are:

257.01.    2015 and 2016 in the case of Moore,

257.02.    2018 and 2019 in the case of Rentz, 2018 in the case of Coggins,

257.03.    2016, 2017, 2018 and 2019 in the case of Bowles,

257.04.    2016, 2017 2018 in the case of Americanos,

257.05.    2016 to 2019 for Sandifer,

257.06.    2016 through 2019 for Pepas, Global and GC, and

257.07.    2019 for Powe.

258.    The Marketing Practices Plaintiffs complied with their obligations to grow and pack watermelons or asparagus in the respective years.

259.    Unbeknownst to members of the Marketing Practices Plaintiffs, Robinson Fresh contracted with far greater volumes of seedless and mini watermelons and asparagus in the same production window than it had capacity to market.

260.    As a result of Robinson Fresh's conduct, loads of watermelons the Marketing Practices Group produced and prepared for shipment were allowed to deteriorate and lose value and had to be dumped. Loads of their asparagus were not sold in a timely fashion.

261.    Watermelons are a product which enter the US market based on the climatic conditions in the area in which they are grown.

262.    Peruvian asparagus also has its specific marketing window.

263.    Due to Robinson Fresh's decision to contract for more volumes of watermelons and asparagus than it could sell, its delayed deliveries of watermelons and asparagus that the Marketing Practices Plaintiffs had harvested and packed.

264.    The melons Robinson Fresh contracted for and received from other growers displaced melons the Marketing Practices Plaintiffs could have shipped.

265. Robinson Fresh delayed the sale of melons and asparagus which the Marketing Practices Plaintiffs had harvested.

266. The mini and seedless watermelons are a perishable product, more perishable than seeded watermelons.

267. As a foreseeable result of the Robinson Fresh's delay in marketing watermelons and asparagus received, the Marketing Practices Plaintiffs suffered damages from lower sales returns and dumped product.

268. As a result of Robinson Fresh's decision to contract for more product than it could sell, some of the Marketing Practices Plaintiffs were left with acres of watermelons that could not be harvested or sold.

269. Due to the exclusivity provision of Robinson Fresh's Agreement as well as its proprietary rights to the variety that the Marketing Practices Plaintiffs grew on its behalf, the Marketing Practices Plaintiffs could not mitigate their damages by selling their watermelons or asparagus to third parties.

270. Moreover, by the time that the Marketing Practices Plaintiffs could have sought Robinson Fresh's written consent to seek another marketer, all other available marketers were already fully committed to other growers.

## XV. EIGHTH CAUSE OF ACTION FOR BREACH OF EXPRESS AND IMPLIED DUTIES UNDER THE PERISHABLE AGRICULTURAL COMMODITIES ACT HANDLING OF THE CROPS OF MARKETING PRACTICES PLAINTIFFS

271. Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

272. Interstate produce trade within the United States is governed by PACA.

273. CHR Worldwide, as a dealer in produce in interstate commerce is subject to PACA and its regulations.

274. CHRW does not hold a PACA license.

275. CHR Company does not hold a PACA license.

276. Robinson Fresh does not hold a PACA license.

277. PACA contains a civil remedy for unfair conduct including breach or failure to perform any, express or implied duty, arising in connection with transactions in perishable agricultural commodities including watermelons.

278. Defendants breached their implied duties under PACA with respect to the marketing of the 2015 and 2016 watermelon crops of Moore, the 2018 and 2019 crops of Rentz, the 2018 watermelon crop of Coggins, the 2016-2019 crops of Bowles, the 2016 – 2018 crops of Americanos, the 2016 – 2019 crops of Sandifer, the 2015 to 2019 crops of Global, CA and Pepas and the 2019 crop of Powe, by:

278.01. Failing to receive and sell product which Marketing Practices Plaintiffs packed and prepared for pickup by Robinson Fresh.

278.02. Failing to market produce received by Robinson Fresh in a timely fashion based on the shelf life of such produce.

278.03. Failing to accept additional product which was left unharvested and unsold due to Robinson Fresh's business decision to contract for too much produce in one production area based on its inability to market them.

278.04.     Making a conscious choice to sign multiple, exclusive distribution contracts with growers with Robinson Fresh as the sole marketer, leaving the Marketing Practices Plaintiffs the and other growers with produce they could not provide to another distributor.

278.05.     Leaving Marketing Practices Plaintiffs in the position of being unable to find alternative marketers when Robinson Fresh's refusal to market became apparent.

278.06.     Making false promises for shipments that never occurred and reimbursements that Marketing Practices Plaintiffs never received.

278.07.     Selling what were originally reported to the Marketing Practices Plaintiffs as rejected loads and then neglecting to pay Plaintiffs for those secondary sales.

279.     CHR Worldwide breached its express duty in the Agreements. Paragraph 5a of the Growing, Packing, and Sales Agreement provides:

> Robinson Fresh will endeavor to identify a viable market for [watermelons] that meets its customers' quality and condition requirements, and shall market such [watermelons] on a consignment basis.

280.     Robinson Fresh's business decision to contract for far more watermelons, squash, and asparagus in a single production region than it could sell resulted in the breach of this provision of the Agreement, and in breaches of its express and implied duties under the Agreement.

281. PACA contains a civil remedy for breaches of unfair conduct in 7 U.S.C. § 499e(a) and (b).

282. the Marketing Practices Plaintiffs have been damaged by Defendants' unfair conduct.

## XVI. NINNTH CAUSE OF ACTION FOR BREACH OF CONTRACT - HANDLING OF THE CROPS OF THE MARKETING PRACTICES PLAINTIFFS

283. Plaintiffs re-allege and incorporate by reference the foregoing allegations as though fully set forth in this paragraph.

284. The Defendants' conduct described breached the Agreements.

285. The Marketing Practices Plaintiffs have been damaged due to Defendants' breach of contract.

## XVII. TENTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY HANDLING OF CROPS - HANDLING OF THE CROPS OF THE MARKETING PRACTICES PLAINTIFFS

286. The Marketing Practices Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as though fully set forth herein.

287. The Grower Packer and Sales Agreement portion of the Agreements refers to Robinson Fresh as an "agent" at least 6 times.

288. Robinson Fresh supplied the Marketing Practices Plaintiffs with the form of the Agreements containing the references to Robinson Fresh as an agent.

289. Robinson Fresh acted as a sales agent for the Marketing Practices Plaintiffs under the Agreements.

290.     Under Minnesota common law and under PACA, Robinson Fresh as a sales agent owed a fiduciary duty to the Marketing Practices Plaintiffs to place the interests of the Marketing Practices Plaintiffs above its own interests with respect to the marketing of Marketing Practices Plaintiffs' produce crops.

291.     CHR Worldwide breached its fiduciary duty to the Marketing Practices Plaintiffs by choosing to honor its contractual commitment to other growers while failing to accept product from Marketing Practices Plaintiffs, by dumping product packed by the Marketing Practices Plaintiffs and failing to sell Marketing Practices Plaintiffs' product in a timely fashion and failing to accept additional deliveries from Marketing Practices Plaintiffs.

292.     Had CHR Worldwide not placed its own contractual interests above those of Marketing Practices Plaintiffs, produce shipments that were accepted from other growers in the same grower region would have been supplied by Marketing Practices Plaintiffs instead.

293.     CHR Worldwide's records reflect that it was accepting product from multiple growers during the same window of time that Marketing Practices Plaintiffs had additional product that could have been received and sold by Robinson Fresh.

294.      Given the market conditions that existed at the time when Robinson Fresh was not accepting additional watermelons from Marketing Practices Plaintiffs, the Marketing Practices Plaintiffs could not place its produce with other distributors.

295.     There was insufficient demand in the market to place the produce with other distributors at that time because these other distributors had their own contractual

commitments to their previously contracted growers.

296.     CHR Worldwide further placed its own contractual interests above those of the Marketing Practices Plaintiffs by re-selling originally rejected produce to vendors either without informing the Marketing Practices Plaintiffs or without paying the Marketing Practices Plaintiffs for the sales they made to secondary vendors.

297.     Rather than selling the more viable product that was decomposing in Marketing Practices Plaintiffs' warehouses and fields, Robinson Fresh chose to make sales on substandard product and retain the majority of those profits for themselves.

298.     The Marketing Practices Plaintiffs have been damaged because of Defendants' breach of fiduciary duty.

## XVIII.     ELEVENTH CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – HANDLING OF THE CROPS OF THE MARKETING PRACTICES PLAINTIFFS

299.     The Marketing Practices Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint, as though fully set forth herein.

300.     Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing.

301.     The Defendants' acts and omissions alleged herein violated the implied covenant of good faith and fair dealing based upon the Agreements.

302.     Defendants' acts and omissions which breached their implied duty of good faith and fair dealing include, but are not limited to the following:

302.01.     the Marketing Practices Plaintiffs were contractually prohibited from mitigating their damages by shipping its product to other receivers because

of the exclusivity provision of the parties' contract.

302.02.　Defendants' conduct and the exclusivity provision unjustifiably hindered Marketing Practices Plaintiffs' performance of the Agreements.

302.03.　Defendants' acts and omissions improperly withheld from the Marketing Practices Plaintiffs their benefits of the bargain.

303.　Defendants' acts and omissions related to the securing of more product than it had the capacity to distribute, and the purchasing product from other growers rather than the Marketing Practices Plaintiffs constituted a subterfuge and evasion of its obligations to the Marketing Practices Plaintiffs under the Agreements.

304.　Defendants breached their implied duty of good faith and fair dealing by failing to notify the Marketing Practices Plaintiffs that Robinson Fresh contracted more product than it had capacity to distribute during and after negotiating the Agreements.

305.　Defendants breached their implied duty of good faith and fair dealing to the Marketing Practices Plaintiffs by continuing to secure the rights and obligations to distribute additional product after consummating the Agreements.

306.　Defendants also breached the implied duty of good faith and fair dealing by failing to timely inform the Marketing Practices Plaintiffs of their inability to distribute the subject product and release the Marketing Practices Plaintiffs from the exclusivity provisions of the Agreements.

307.　The Marketing Practices Plaintiffs have been damaged because of Defendants' breach of the implied duty of good faith and fair dealing.

## XIX.    PRAYER FOR RELIEF.

308.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request the Court enter judgment against Defendants, C.H. Robinson Worldwide, Inc. d/b/a C.H. Robinson Company, Inc., C.H. Robinson Company, and Robinson Fresh, jointly and severally, as follows:

309.    Certifying that each Cause of Action may be maintained as a class pursuant to Fed. R. Civ. P. 23 including defining the Class, California Sub-Class, and Georgia Sub-Class, and defining the Class Claims, California Sub-Class Claims, and Georgia Sub-Class Claims, and appointing Plaintiffs to represent those classes and their attorneys to act as class counsel;

310.    Final judgment for an accounting and damages in favor of Plaintiffs and the Class and against Defendants for the sum of at least damaged in an amount of the pallet rebates, the seed rebates, other third-party rebates, freight prompt payment discounts, and the difference between the freight actually paid by Defendants and the amounts final customers paid Defendants for freight for breach of express and implied obligations under Section 2 of the PACA for the handling of the produce crops, plus costs.

311.    Final judgment for an accounting for all revenues and expense related to Plaintiffs' accounts and damages in favor of Plaintiffs and the Class, California Sub-Class, and Georgia Sub-Clas and against Defendants for the sum of at least damaged in an amount of the pallet rebates, the seed rebates, other third-party rebates, freight prompt payment discounts, and the difference between the freight actually paid by Defendants and the amounts final customers paid Defendants for freight, plus costs and attorney's

fees for breach of the Agreements.

312.	Final judgment for an accounting and damages in favor of Plaintiffs, the Class, California Sub-Class, and Georgia Sub-Clas and against Defendants for the sum of at least damaged in an amount of the pallet rebates, the seed rebates, other third-party rebates, freight prompt payment discounts, and the difference between the freight actually paid by Defendants and the amounts final customers paid Defendants for freight for breach plus costs, for breach of fiduciary duty under the Agreements.

313.	For entry of a Final Judgment in favor of Plaintiffs and the Class, California Sub-Class, and Georgia Sub-Class and against Defendants in the amount of the pallet rebates, the seed rebates, other third-party rebates, freight prompt payment discounts, and the difference between the freight actually paid by Defendants and the amounts final customers paid Defendants for freight for breach of for breach of fiduciary duty for handling of the produce crops plus costs and attorney's fees for breach of the duty of good faith and fair dealing under the Agreements.

314.	For entry of a Final Judgment in favor of Plaintiffs and the Class, California Sub-Class, and Georgia Sub-Class and against Defendants in the amount of the pallet rebates, the seed rebates, other third-party rebates, freight prompt payment discounts, and the difference between the freight actually paid by Defendants and the amounts final customers paid Defendants for freight, subject to doubling as permitted under Minnesota law for civil theft.

315.	For entry of a Final Judgment of forfeiture of commissions by Defendants to the Plaintiffs for breach of fiduciary duty.

316. For entry of a Final Judgment of forfeiture of commissions by Defendants to MEK, Powe, and the Georgia Sub-Class, for engaging in unlicensed produce operations within the State of Georgia.

317. For entry of a Final Judgment of forfeiture of commissions by Defendants to Bowles and the California Sub-Class, for engaging in unlicensed produce operations within the State of California.

318. For damages in favor of the Marketing Practices Plaintiffs and against Defendants under Section 2 of PACA in an amount of the revenues lost by the Marketing Practices Plaintiffs due to the conduct of Defendants in marketing of the Marketing Practices Plaintiffs crops in the years stated herein, in plus costs and attorney's fees.

319. For damages in favor of the Marketing Practices Plaintiffs and against Defendants for breach of contract under the Agreements in an amount of the revenues lost by the Marketing Practices Plaintiffs due to the conduct of Defendants in marketing of the Marketing Practices Plaintiffs crops in the years stated herein plus costs and attorney's fees.

320. For damages in favor of the Marketing Practice Plaintiffs and against Defendants for breach of the duty of good faith and fair dealing in the of the revenues lost by the Marketing Practices Plaintiffs due to the conduct of Defendants in marketing of the Marketing Practices Plaintiffs crops in the years stated herein, plus costs and attorney's fees.

321. For damages in favor of the Marketing Practices Plaintiffs and against Defendants for breach of fiduciary duty under the Agreements in the of the revenues lost

by the Marketing Practices Plaintiffs due to the conduct of Defendants in marketing of

the Marketing Practices Plaintiffs crops in the years stated herein, plus costs.

322. Awarding costs of suit as allowed by law; and

323. For such other and further relief as may be just and proper.

## XX. JURY DEMAND.

324. Demand is hereby made for trial by jury.

Dated: January 16, 2020

Respectfully submitted,

*/s/* Craig A. Stokes

Craig A. Stokes (MN Attorney ID # 0390849)
STOKES LAW OFFICE LLP
3330 Oakwell Court, Suite 225
San Antonio, TX 78218
Telephone: (210) 804-0011
Facsimile: (210) 822-2595
Email: cstokes@stokeslawofffice.com

*Attorney for Plaintiffs, David Moore d/b/a Moore Family Farms, Terry Lusk, Jason Lusk, and Justin Lusk, individually and d/b/a JTJ Farms, Kevin Rentz, Amanda Calhoun Rentz, Dennis Bruce Rentz, and Karla Jo Rentz d/b/a Rentz Family Farms, Kevin Coggins d/b/a MEK Farms, Bowles Farming Company, Inc., Agropecario Los Americanos S.C. de R.L. de C.V. Phil Sandifer & Sons Farms, LLC, JMB Farm, LLC, Powe Farms Management, LLC, CA Comercial, S.A.C., Global Fresh, S.A.C. and Pepas Tropicales del Peru.*