UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

DAVID MOORE d/b/a MOORE
FAMILY FARMS, *et al.*,

                Plaintiffs,

                                Case No. 20-cv-252 (PJS/ECW)

v.

C.H. ROBINSON WORLDWIDE,
INC., *et al.*,

                Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' RESPONSE TO MOTIONS TO EXCLUDE
EXPERT AND OPINIONS AND FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

*Page*

ARGUMENT ................................................................................................................... 1

I.   Dr. Paul Teague's Damages Opinions are Sufficiently Reliable to be
     Admissible Under Rule 702 ................................................................................. 1

     A.   The *Daubert* Standard for Admissibility ................................................. 1

     B.   Dr. Teague's Opinions Meet the Admissibility Requirements of
          Rule 702 and Daubert ............................................................................. 3

          1.   Dr. Teague's Market Demand Opinion is Reliable Because
               it is Derived from Objective Data and Avoids Speculation ...... 9

          2.   Dr. Teague's Crop Yield Opinion is the Product of
               Industry-Accepted Estimation Methodologies and
               Accounts for the Parties' Contractually Agreed Upon
               Limits ......................................................................................... 14

          3.   Dr. Teague's Damages Calculation is Not Based Upon an
               Assumption of a Contractual Obligation to Sell All
               Produce; it is Based Upon a Conclusion that CHR Could
               Have Sold All of the Plaintiffs' Produce ................................... 16

II.  Defendants Have Not Established a Basis for Summary Judgment as to
     Any of the Grounds Raised in Their Motion .................................................... 19

     A.   Summary Judgment Standard of Review ................................................ 19

     B.   Plaintiffs Have Viable Damages Claims Against Defendants ........... 19

          1.   Paul Teague's Opinions are Admissible and are Sufficient
               to Raise Genuine Issues of Material Fact as to the Damages
               Suffered by Townsend, Rentz, and Sandifer ........................... 20

          2.   Even with Some Concessions, there are Fact Questions as
               to Plaintiff Moore's Damage ..................................................... 21

          3.   There are Fact Questions as to Powe's Non-Withdrawn
               Damages ..................................................................................... 23

     C.   Plaintiffs' Claims Under PACA are Also Viable .................................. 25

D.     Plaintiffs' Breach of Contract Claims Should Go to the Jury Because There are Fact Questions About Whether CHR Actually "Endeavored" to Fulfill its Contractual Obligations ........................... 28

E.     Plaintiffs' Breach of Fiduciary Duty Claim is Founded Upon Cognizable Statutory and Common Law Fiduciary Obligations Owed by Defendants to Plaintiffs ........................................................... 31

       1.     Defendants Owed Plaintiffs a Fiduciary Duty Under PACA ............................................................................... 32

       2.     Defendants Owed Plaintiffs a Fiduciary Duty Under Minnesota Law ............................................................. 35

F.     Fact Questions Preclude Summary Judgment as to Plaintiffs' Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing ................................................................................ 39

CONCLUSION AND PRAYER ................................................................... 42

CERTIFICATE OF SERVICE ..................................................................... 43

# INDEX OF AUTHORITIES

*Page*

## Cases

*Academy Bank, N.A. v. AmGuard Ins. Co.,*
116 F.4th 768 (8th Cir. 2024) .............................................................................. 2

*Allen v. Thom,*
No. A07-2088, 2008 WL 2732218 (Minn. App. July 15, 2008) ........................ 39

*Anderson v. Farm Serv. Agency of U.S. Dep't of Agr.,*
534 F.3d 811 (8th Cir. 2008) ............................................................................. 15

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................................... 19

*Central Specialties, Inc. v. Minn. Dep't of Transp.,*
5 N.W.3d 409 (Minn. App. 2024) ...................................................................... 40

*Children's Broadcasting Corp. v. Walt Disney Co.,*
245 F.3d 1008 (8th Cir. 2001) ........................................................................... 38

*Columbia Cas. Co. v. 3M. Co.,*
814 N.W.2d 33 (Minn. App. 2012) .................................................................... 39

*Coosemans Specialties, Inc. v. Dep't of Agr.,*
482 F.3d 560 (2nd Cir. 2007) ............................................................................ 27

*CRI, Inc. v. Watson,*
608 F.2d 1137 (8th Cir. 1979) ........................................................................... 39

*D'Arrigo Bros. Co. of New York, Inc. v. KNJ Trading, Inc.,*
No. 19-CV-1129 (AJN), 2020 WL 2060355 (S.D.N.Y. Apr. 29, 2020) ............. 29

*Dahl v. Charles Schwab & Co.,*
545 N.W.2d 918 (Minn. 1996). .......................................................................... 36

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ............................................................................. 1, 3, 13, 16

*Farmers Co-Op Elevator Co. of Atwater v. Enge,*
148 N.W. 465 (Minn. 1914) ............................................................................... 36

*Page*

*First Nat. Bank of Blooming Prairie v. Olsen,*
403 N.W. 2d 661 (Minn. App. 1987)............................................................36-37

*Golman-Hayden Co. v. Fresh Source Produce, Inc.,*
217 F.3d 348 (5th Cir. 2000) ................................................................25

*Group Health Plan, Inc. v. Philip Morris USA, Inc.,*
344 F.3d 753 (8th Cir. 2003) ................................................................12

*Harry Klein Produce Corp. v. U.S.D.A.,*
831 F.2d 403 (2d Cir. 1987)..........................................................32, 34

*Holzer v. Tonka Bay Yachts and Marine Sales, Inc.,*
386 N.W. 2d 285 (Minn. App. 1986) ..................................................36

*In re Hennepin County 1986 Recycling Bond Litig.,*
540 N.W.2d 494 (Minn. 1995)............................................................39

*Jurek v. Thompson,*
241 N.W.2d 788 (Minn. 1976)..............................................35, 37, 38

*Kuhmo Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ..............................................................................1

*Mastronardi Int'l Ltd. v. SunSelect Produce (Cal.), Inc.,*
No. 1:18-CV-00737-AWI, 2019 WL 3996608 (E.D. Cal. Aug. 23, 2019).........25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ............................................................................19

*Norris v. Boston Music Co.,*
151 N.W. 971 (Minn. 1915) ...............................................................36

*Ricci v. DeStefano,*
557 U.S. 557 (2009) ............................................................................19

*St. Paul Fire & Marine Ins. Co. v. Microsoft Corp.,*
102 F.Supp.2d 1107 (D. Minn. 1999)..................................................29

*Page*

*State v. Campbell,*
756 N.W.2d 263 (Minn. App. 2008) ................................................................... 35

*Sterling Capital Advisors, Inc. v. Herzog,*
575 N.W.2d 121 (Minn App 1998) ............................................................... 39, 40

*Torgerson v. City of Rochester,*
643 F.3d 1031 (8th Cir. 2011) ........................................................................... 19

*United States v. Finch,*
630 F.3d 1057 (8th Cir. 2011) ........................................................................... 14

*U.S. Bank Nat'l Assoc. v. San Antonio Cash Network,*
252 F. Supp.3d 714 (D. Minn. 2017) ................................................................. 35

*U.S. Sec. & Exch. Comm'n v. Pritzker Levine LLP,*
20-17419, 2022 WL 671020 (9th Cir. Mar. 7, 2022) .......................................... 12

*Warner v. Martin,*
52 U.S. 209 (1850) ............................................................................................ 36

*White Stone Partners, L.P. v. Piper Jaffray Cos., Inc.,*
978 F.Supp. 878 (D. Minn. 1997) ...................................................................... 39

*Woods v. DaimlerChrysler Corp.,*
409 F.3d 984 (8th Cir. 2005) ............................................................................. 19

## Statutes and Statutory Materials

7 U.S.C. § 499a ...................................................................................................... 20

7 U.S.C. § 499b ...................................................................................................... 26

7 C.F.R. § 46.30 ..................................................................................................... 38

H.R. Rep. No. 543, 98th Cong., 2d Sess. 3 (1983) ................................................. 26

## Administrative Decisions

*In re Friedmeyer,*
42 Agric. Dec. 126, 1982 WL 37853 (U.S.D.A. 1982) ........................................ 33

*In re Harry Klein,*
  46 Agric. Dec. 134, 1987 WL 114975 (U.S.D.A. 1987)......................................34

*In re Kaplan's Fruit & Produce Co.,*
  44 Agric. Dec. 333, 1985 WL 62974 (U.S.D.A 1985)........................................34

*In re Mandell, Spector, Rudolph Co.,*
  24 A.D. 651 (U.S.D.A. 1965)..............................................................................33

*In re Produce Distribs., Inc.,*
  58 Agric. Dec. 506, 1999 WL 46537 (U.S.D.A 1999)..................................34, 35

## Rules

Fed. R. Civ. P. 56 ..................................................................................................19

Fed. R. Evid. 702 ....................................................................................................1

Fed. R. Evid. 702 advisory comm. Notes ..............................................................2, 3

Fed. R. Evid. 703 ....................................................................................................15

## Secondary Sources

Black's Law Dictionary, "Endeavor" (12th ed. 2024) ..............................................30

Restatement (Second) of Agency § 1......................................................................35, 38

Restatement (Second) of Agency § 13....................................................................35

Restatement (Third) of Agency § 6.02 ...................................................................36

Restatement (Second) of Contracts § 205 ..............................................................39

Steven J. Burton, *Breach of Contract and the
  Common Law Duty to Perform in Good Faith,*
  94 Harv. L. Rev. 369 (1980)..............................................................................39

**ARGUMENT**[1]

**I.    Dr. Paul Teague's Damages Opinions are Sufficiently Reliable to be Admissible Under Rule 702**

As an overarching argument purportedly applicable to the claims of Plaintiffs Townsend, Rentz, and Sandifer, Defendants seek the exclusion of Paul Teague's expert opinion testimony.  ECF 230 at 7-19.  They contend that Dr. Teague fails to sufficiently identify the specific size of an additional market for Plaintiffs' produce.  *Id*. at 9-13.   They further mischaracterize Mr. Teague's crop yield estimates as speculative.  *Id.* at 13-16.  And they dispute the legal basis for Mr. Teague's calculations regarding the amount of damages.  *Id.* at 16-19.  As shown below, those arguments fail and the motion to exclude Dr. Teague's testimony should be denied.

**A.    The *Daubert* Standard for Admissibility**

The admission of expert witness testimony is a matter that is left to the discretion of the district court.  *See Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993).  The newly amended Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education, may testify in the form of an opinion or otherwise, if the proponent demonstrates to the court that it is more likely than not that (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data, (c) the testimony is the product of reliable

---

[1] Defendants offer a "Statement of Undisputed Facts" in their motion.  Plaintiffs agree that the facts set forth in that statement are undisputed and, as such, do not offer a rebuttal here.

principles and methods, and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the Advisory Committee Notes to the 2023 Amendment to Rule 702 make clear, "[n]othing in the amendment imposes and new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement [i.e. preponderance of the evidence requirement] applies to expert opinions under Rule 702." Fed. R. Evid. 702 advisory comm. notes ¶ 10.

The Eight Circuit has framed the *Daubert* inquiry as a three-part test:

First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Academy Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 790 (8th Cir. 2024). A district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 791 (internal citations omitted). Further, the Eight Circuit has recognized that "generally, *Daubert* calls for the liberal admission of expert testimony." *Id.* Indeed, "as long as the expert's [] testimony rests upon good grounds, based on what is known it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Id.* (internal quotations and citations omitted).

Ultimately, even as revised, Rule 702 maintains fidelity to *Daubert's* baseline notion that "[v]igorous cross-examination, presentation of contrary evidence, and

careful instruction on the burdens of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. And nothing in the 2023 amendment to Rule 702 changes this fact. Indeed, the Advisory Committee notes maintain that "[s]ome challenges to expert testimony will raise matters of weight, rather than admissibility even under the Rule 104(a) standard," and "nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support." Fed. R. Evid. 702 advisory comm. notes ¶¶ 5,10.

**B.    Dr. Teague's Opinions Meet the Admissibility Requirements of Rule 702 and Daubert**

Three Plaintiffs – Townsend, Rentz, and Sandifer (the "Three Growers") -- designated Paul Teague, Ph.D., as an expert to testify regarding the existence of a viable market for the Three Growers' produce and the extent of such a market, if it existed. *See Plaintiffs' Rule 26(a)(2)(C) Expert Disclosures* (2/11/2022) at 1 (Ex. 1)[2]; *Teague Depo.* at 9:8-24 (Ex. 2). Though Defendants do not dispute his qualifications, ECF No. 230 at 9-19, it warrants mention that Dr. Teague earned a Ph.D. in Agricultural Economics from Texas A&M University in 1985 and that he has extensive experience in produce brokerage, packaging, shipping, and selling. Ex. 2 at 13:6-20:19, 31:23-38:5, 41:15-46:8, 47:2-53:1. Indeed, since 1992, Dr. Teague has worked in those fields in a variety of locations across the United States. *See id.; see*

---

[2] Plaintiffs evidence is attached as exhibits to the Declaration of Francisco Guerra (Ex. A). For ease of reference, the exhibits are cited here by the number used to identify them in Mr. Guerra's declaration.

*also Teague Report* at 1-3 (Ex. 3).[3]  Along with that hands-on experience, his education in the economics of the particular transactions at the heart of this dispute is directly relevant to the damages opinions he offers in this case.  Against that backdrop, his expertise in the relevant field is understandably unquestioned.  Thus, though his qualifications are not disputed, the record demonstrates Dr. Teague's deep and relevant background in dealing with the conditions and markets assessed in his testimony.

His report details the methodology that Dr. Teague employed to reach his conclusions in this case.  Ex. 3 at 6-7.  Before delving into any conclusions, Dr. Teague explained that he brought his 30 years' of experience -- gained through growing, packing, and selling melons -- to bear upon the issues in this case.  In broadly applicable terms, he explained that in reaching his conclusions, he relied upon records of past years' crop production and yields, if those records were available.  *Id*. at 6.  That study revealed that the Three Growers "are all excellent growers . . . with good and profitable yields" in the preceding years.  *Id.*  That assured him that "there is no reason to expect their 2018 crops to be any different in terms of yield and quality."  *Id.*  Against that background, he also considered the schedules that were incorporated into the Three Growers' contracts with CHR and, for Townsend and Rentz, he compared his calculations of production and yield with those schedules.  *Id.*  That was important *inter alia* to place a ceiling on

---

[3]  CHR relies repeatedly upon Dr. Teague's report as an exhibit to its Motion to Exclude.  ECF No. 230 at 9, 10, 13, 16, 17.  In addition it presented the report as an exhibit at Dr. Teague's deposition and asked him to authenticate the report.  *See* Ex. 2 at 11:5-17 (authenticating Exhibit 584).

the damages that any of the Three Growers might have suffered. *Id.* ("I capped the maximum amount of produce available for sale to any viable market to the contracted yield projection in each of the Three Growers 2018 contracts with CHR."). Thus, while the contracted yields were important to Dr. Teague's conclusions, they did not provide the baseline assessment of the basic inputs of his opinion. Indeed, Dr. Teague expressly noted that he used the available data to make a more granular assessment of the Three Growers' production, saying that he "reviewed and used historical yield data for the Three Growers and used that, where needed to calculate historical average yields of mini and regular seedless watermelons and cantaloupe." *Id.* This allowed him to confirm, for instance, that Townsend "exceeded the per acre contracted volume for conventional seedless watermelon" and that both the average production and the 2018 shipments exceeded that contracted volume. *Id.* at 7. Dr. Teague considered the weekly shipping and settlement data that CHR has provided in this litigation. *Id.* at 6.

His threshold inquiry was ascertaining whether a viable market existed for unharvested and unsold production by the Three Growers. Ex. 3 at 7. To make that assessment, Dr. Teague examined the weekly summaries CHR maintained for all growers who were supplying melons in the relevant market – the Southeastern United States – during the relevant time period – an 11-week period running from the week ending June 4, 2018, to the week ending August 13, 2018. *Id.* at 7. Though CHR summaries contained data for East Coast Growers and West Coast Growers, Dr. Teague explained that he only considered the data concerning growers who were directly competing with the Three Growers "while melons remained

unharvested and unsold" by them. *Id.* In fact, Dr. Teague specifically identified each of these "Alternative" growers and assessed the geographical proximity of those Alternatives to each of the Three Growers. *Id.* The Alternatives, he noted, were all located within 300 miles of the Three Growers. *Id.* at 8. He grouped the Alternatives by their geographical proximity to each of the Three Growers, explaining based upon his experience that "the relatively short distances between each of the Three Growers and their respective Alternatives are short enough that melons obtained from an Alternative are melons that could have been supplied from one [or] more of the Three Growers." *Id.*

Dr. Teague explained that by comparing CHR's weekly summaries, he was able to have a direct observation on when CHR was receiving melons from each of the Alternatives and compare that with the volume of melons the Three Growers could have harvested and had sold on their behalf by CHR. Ex. 3 at 8. And from that data, he was able to conclude that production that CHR obtained from each of the Alternatives "could have been supplied" by each of the Three Growers. *Id.* Summing up that conclusion, Dr. Teague explained that "The fact that CHR was sourcing melons from each of the Alternatives during the time that the respective Three Growers were producing melons allows me to conclude that there was a viable market for each of the Three Growers for product that they were not allowed to ship for CHR." *Id.* This was more than a mere conclusory statement. Dr. Teague assembled a chart assessing the week-by-week analysis of the amounts of the specific products that the Three Growers had available and compared that – on the same time horizon and with the same product specificity

– to the specific amounts of the specific products that the Alternatives supplied to CHR. *Id.* at 9-11.

Having broadly assessed that a viable market existed, Dr. Teague used the data to examine what the Three Growers actually shipped in 2018 and what they *could have* shipped, explaining that "[i]f they did not have sufficient production or could not have reasonably supplied that production, then they could not have supplied the viable market that existed for watermelons and cantaloupes in 2018." Ex. 3 at 11. Though this involved comparing actual shipments to historical average yields or yield projections, he noted that the very methodology "is used frequently in calculating crop insurance claims." *Id.* And Dr. Teague advised that using historical average data for a particular farm or grower, along with projections of potential yield and time have applications beyond this litigation, including managing harvests, marketing a crop, and making market commitments. *Id.* Thus, Dr. Teague has used those methods in calculating both yield projections and farm losses. Though acknowledging that actual counts and observations of product in the field are almost always preferrable, he added that "historical averages are useful in the absence of actual determination of loss by physical sampling." *Id.* In any event, Dr. Teague observed that "the record keeping and organization of data" by the Three Growers was "excellent." *Id.* at 12.

Here, he had growing, shipping, packing, and acreage data for 2018 for all Three Growers; for Townsend and Sandifer, Dr. Teague also had recent historical yield data to include in his calculations. Ex. 3 at 11. For instance, for Townsend, Dr. Teague reviewed and used data regarding product packed and not sold, which

came from actual shipping and packing records or bills of lading.  *Id.* at 11-12.  For the Three Growers, he looked at yield projections and the CHR planting schedule, which revealed both potential yield and marketing intentions for 2018, but he also noted that the actual amount packed and shipped by each of the Three Growers in 2018 was less than their historical averages, a fact that "supports the testimony of all the growers that product went unharvested in 2018."  *Id.* at 12.  By comparing what orders the Alternatives received from CHR and the quantities of melons each of the Three Growers shipped to CHR, Dr. Teague could "calculate the volume of melons for which CHR had a viable market but did not receive from the Three Growers."  *Id.*  But that comparison came with a caveat: Dr. Teague "excluded from the calculation of the viable market . . . any potential product above the volumes contained in their respective contracts with CHR for 2018."  *Id.*  Thus, again, the contracted yield was a ceiling on the calculation, not the focal point of the calculation.

For each of the Three Growers, Dr. Teague engaged employed a rigorous analysis to arrive at a net damage calculation.

For Townsend and Sandifer, for whom he had historical yield data among other relevant information, Dr. Teague assessed the projected contract yield on a per acre basis, then subtracted actual shipments per acre from the projected yield to devise an amount of product per acre that was not shipped.  Then, he multiplied the amount of the product not shipped by the acreage under contract and obtained a poundage of product that was not accepted.  He used the 2018 data of how the shipped melons were packaged and applied that ratio to the poundage figure he

obtained, estimating the number of cartons and bins. He obtained prices net of commissions that CHR had actually paid for cartons and bins for the week ending July 7, 2018, a figure obtained from CHR's own records and then estimated a "gross loss in income" for each farm. Importantly, though, Dr. Teague then deducted costs that would have been incurred in harvesting and packing the melons from the gross figure to arrive at an estimated net loss. Ex. 3 at 13-14, 15-17. For Rentz, where no historical yield data was available, Dr. Teague relied upon estimates. But, again, his calculation ascertained a net loss for both seedless watermelons and cantaloupes. *Id.* at 14-15.

Unsurprisingly, Defendants disagree with Dr. Teague's conclusions. And they argue against the admissibility of Dr. Teague's opinions regarding market demand, crop yields, and the damages calculation. Each argument, however, fails.

1. **Dr. Teague's Market Demand Opinion is Reliable Because it is Derived from Objective Data and Avoids Speculation**

In their first attack, Defendants argue that Dr. Teague's opinions regarding the existence of a viable market for the Three Growers' produce are vague and that they overestimate that market. ECF No. 230 at 9-13. But those arguments assail Dr. Teague for a refusal to retrospectively speculate about a counterfactual market.

What Dr. Teague's report and testimony readily establish is his effort to view the existing data holistically and to empirically identify a viable market for the Three Growers' produce. Specifically, he testified repeatedly that the data bore out that CHR had additional business – beyond the business already given to the Three Growers – for their produce. Ex. 2 at 158:4-159:2 ("What you are asking me

was, did C.H. Robinson have additional business that these guys – Rentz in particular – didn't get? Yes, they did, because they were loading cantaloupes and seedless watermelons with other people."), 159:4-160:8 (observing that Alternative Growers had "loaded three times as many cantaloupe as Rentz had loaded by that time" from one alternative, "and they loaded almost twice as many watermelons with" another alternative), 161:21-162:7 ("there was additional business out there. [CHR] was the one that chose how to mete those – mete that out."), 163:6-164:12 ("it is obvious that [CHR was] loading way more with alternative growers at that point than they were with these three growers."), 163:8-164:12 (observing that Three Growers had available produce, but CHR was "giving a bunch of business to these other alternative growers on that week."). When pressed to state the size of the viable market, he acknowledged that an exact number was unavailable, but explained that "during the entire time of all three of these growers [CHR} was loading significant amount of produce with other growers, and some or all of that business could have been shifted to our growers, and [CHR] chose not to do that, for whatever reason." *Id.* at 164:13-165:20, 166:14-167:6 (disclaiming any opinion that CHR had contractual obligation to ship all produce of Three Growers, but explaining that CHR could have given business than it did to the Three Growers, as reflected "by the fact that they achieved neither their historical average nor their [CHR] yield projection."). Indeed, Dr. Teague summarized his conclusion to be: "number 1, the business was there because [CHR] was giving it to other people," and "number 2, their historical records, so that these growers had the product [but] they didn't even make their historical projection, much less their historical

average." *Id.* at 167:7-169:17. That is, CHR "had the business . . . and they could have given these three growers more business than they did, and [CHR] didn't do it." *Id.* at 171:20-172:8, 176:21-177:17.[4]

In essence, Defendants contend that unless Dr. Teague can precisely define the extent of a market that CHR never fairly indulged, the Three Growers cannot establish damages. Not so. Dr. Teague's opinions do two important things here. First, his analysis shows that CHR's choices in giving business to growers were quantifiably lopsided and disproportionately disadvantageous to the Three Growers, who were deprived of the opportunity to consign available produce under the terms of their agreements with CHR. Ex. 3 at 9-10. Again and again, Dr. Teague makes that very point with specific data. Second, the data shows an upper limit to the Three Growers' damages specifically defined by the quantities of produce they were contracted to sell. *See id.* at 13-17.

Defendants contend that the flaw in Dr. Teague's opinions about "the size of the additional market," is that it fails to "set the upper limit of Plaintiffs' damages claims." ECF No. 230 at 11. But that wholly ignores Dr. Teague's recognition that his analysis ends with the contractual projections. Ex. 2 at 170:16-171:18 ("it [is not] reasonable to hold [CHR] responsible for selling more than their projection."). Said differently: Dr. Teague simply opines that CHR could have received on consignment more produce from the Three Growers than it did, that

---

[4] Concerns for the nature of the broader American market were not relevant to Dr. Teague's analysis, since he was focused upon whether CHR could have met its demand by using the Three Growers' produce. Ex. 2 at 177:18-179:6

the availability of that market is borne out by the disproportionate amount of business given to other growers from whom CHR also received melons on consignment, and that the upper limit for this alternative market for the Three Growers' produce is defined specifically by the contractual projections. As demonstrated in his report and testimony, those parameters permitted Dr. Teague to calculate an upper limit for the net losses sustained by each of the Three Growers in 2018.

Insisting upon a more precise answer would necessarily require substantial speculation by Dr. Teague or any other expert. Indeed, the question faced by Dr. Teague is entirely counterfactual: assess the market share that *might* have existed if CHR had behaved differently. It is true, as the Eighth Circuit has recognized, that "counterfactual estimations" require "a certain amount of speculation," and that the degree of that speculation "goes to the weight of the testimony." *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 760 (8th Cir. 2003); *cf. U.S. Sec. & Exch. Comm'n v. Pritzker Levine LLP*, 20-17419, 2022 WL 671020, at *5 (9th Cir. Mar. 7, 2022) (Baker, J., dissenting) ("counterfactuals by their nature . . . require the fact finder to speculate what would have happened if the defendant had not done what she in actual fact did."). But it is also true that too much speculation by the expert is fatal. *Group Health Plan, Inc.*, 344 F.3d at 760. Here, Dr. Teague has threaded that needle. He has provided ample basis for an opinion that a viable market existed for the Three Growers' produce through his use of actual data. He has used that data to assess an upper limit for that market. And he has refused to speculate about the precise delta between the actual market that afflicted the Three

Growers and the maximal market for their products. Defendants' quarrels with that assessment go, as the Eighth Circuit has recognized, to the weight of the testimony and are absolutely fodder for rigorous cross-examination and the presentation of contrary proof (including the opinions of Defendants' own experts). *See Daubert*, 509 U.S. at 596. But Dr. Teague's refusal to speculate about the precise size of the counterfactual viable market furnishes no basis for the exclusion of a manifestly relevant and reliable opinion about a matter that is indisputably beyond the jury's common understanding.

Relatedly, Defendants assail Dr. Teague for failing to divide the demand among the Three Growers. ECF No. 230 at 12-13. This, they say, "causes [Dr.] Teague to overestimate the additional market for Plaintiffs' produce." *Id.* at 13. But that is demonstrably untrue. As the foregoing demonstrates, Dr. Teague opines that the viable market is limited to the actual amounts of produce that CHR procured from its growers and the Three Growers' potential share of that viable market is capped at their contractual yields. And while Dr. Teague did not attempt the speculative task of dividing that viable market among the Three Growers, he did testify – in recognizing that the Three Growers were in competition with each other – that "it would be up to the handler [CHR] to allocate that business amongst those three growers depending on what they had available at that time." Ex. 2 at 114:5-115:1. Based on the totality of the facts presented to it, the jury can certainly assess the degree to which the viable market might have been reallocated among the Three Growers. As such, the refusal to speculate about how the viable market might have been allocated among the Three Growers is a matter of the weight to

be accorded to Dr. Teague's testimony, but not its threshold admissibility. After all, "[d]oubts . . . about the admissibility of expert testimony should be resolved in favor of admission." *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011).

> **2.    Dr. Teague's Crop Yield Opinion is the Product of Industry-Accepted Estimation Methodologies and Accounts for the Parties' Contractually Agreed Upon Limits**

Part of the basis for Dr. Teague's opinion about the Three Growers' damages is his assessment of the supply of produce the Three Growers could have furnished to CHR. *See* Ex. 3 at 11-13. Dr. Teague relies upon a variety of inputs to reach his conclusion that the Three Growers had sufficient supply to fulfill the viable market he identified. *Id.* Despite that, Defendants insist that the opinion is speculative because it is based upon certain assumptions. ECF No. 230 at 13-16. The record belies that claim and supports the reliability of Dr. Teague's crop yield opinions.

First, CHR notes the undisputed truth that the absolute best way to estimate the size of a crop is to subject it to visual inspection or physical sampling. ECF No. 230 at 13. Applying that methodology retrospectively is obviously impossible, as Dr. Teague notes. Ex. 2 at 182:23-184:12 ("So in this case, that's what happened, the lawsuit was filed after the crop had already been destroyed."). Where that impossibility arises, people within the industry use estimation methods to ascertain that value. *See* Ex. 3 at 11 ("The methodology of comparing actual shipments to recent historical average yields or yield projections for the year or years in which a loss was sustained is used frequently in calculating crop insurance claims," in "managing harvest or marketing a crop," and in "making market commitments."); Ex. 2 at 183:8-184:12 ("it hardly ever happens in these

crop loss cases that you are able to go and get the actual counts with observation."). To that end, within the relevant industry, estimates based at least in part upon historical averages "are useful in the absence of actual determination of loss by physical sampling." *Id.; see also* Fed. R. Evid. 703 (permitting experts to rely upon even inadmissible facts or data if of a type reasonably relied upon by experts in a particular field); *accord Anderson v. Farm Serv. Agency of U.S. Dep't of Agr.*, 534 F.3d 811, 815 (8th Cir. 2008) (discussing federal regulations tying extent of insurance payments for lost crop to historical yields).

At that, Defendants argue that Dr. Teague did nothing more than make assumptions based upon the projections in their CHR contracts. ECF No. 230 at 14-15. But that is not at all what Dr. Teague concluded. Dr. Teague expressly states that he had "excellent" records of "growing, shipping, packing and acreage data for 2018" for each of the Three Growers, and that he had recent historical yield data for Townsend and Sandifer. Ex. 3 at 11. But he also used CHR's yield projections and planting schedule (noting those variables were both "devised and used by CHR for planning purposes") as the potential yield. *Id.* at 12. In fact, he explained that he "did not use the historical averages" because the "damages would have been even worse if we had . . . because the historical averages are way above their [CHR] projections." Ex. 2 at 184:13-185:16. He observed that the amount packed and shipped for each in 2018 was less than historical averages, a fact that "supports the testimony of all the growers that product went unharvested in 2018." *Id.;* Ex. 2 at 180:15-181:16. But accepting that fact was not simply a matter of blindly accepting the growers' testimony; indeed, Dr. Teague made clear that

each of the growers had "production histories [that] reveal that they are all excellent growers . . . with good and profitable yields in the last few years," leaving him with "no reason to expect their 2018 crops to be any different in terms of yield and quality." Ex. 3 at 6; Ex. 2 at 167:7-169:17.

That is, Dr. Teague looked first to historical data to substantiate the growers' yield claims as to the unharvested portion of the 2018 crop, then reduced the crop yield estimate for each of them downward to meet the CHR projections. *Id.* Thus, Dr. Teague employed a methodology that is standard in the industry, applied it to the data he had before him, and adjusted his assessments downward to account for the actual contractual limits the parties had agreed to. These are hardly the "unverified assumptions" that Defendants suggest. ECF No. 230 at 16. Again, if Defendants believe that those inputs are dubious, they can make that clear to the jury. *See Daubert*, 509 U.S. at 596. But Dr. Teague has done precisely what Rule 702 demands in arriving at his crop yield estimates and his opinion on that issue is also admissible.

### 3. Dr. Teague's Damages Calculation is Not Based Upon an Assumption of a Contractual Obligation to Sell All Produce; it is Based Upon a Conclusion that CHR Could Have Sold All of the Plaintiffs' Produce

Finally, Defendants contest Dr. Teague's damages calculations, largely arguing that the calculations incorrectly presume that CHR was obligated to receive on consignment "unharvested or unsold" produce. ECF No. 230 at 16-19. A large portion of this argument deals with the legal question of CHR's obligations under its contracts with the Three Growers. *Id.* at 17-18. But for purposes of the

Rule 702 analysis, the record is clear that Dr. Teague's opinion does not derive from a conclusion regarding a contractual obligation to receive all of the proposed yield. It arises from a conclusion that a sufficient viable market for the Three Growers' produce existed for CHR to have received more of the Three Growers' produce on consignment than it did, up to the full amount of the proposed yield.

Contrary to Defendants' contention, Dr. Teague did not assume that "CHR is responsible to compensate Plaintiffs if CHR did not succeed in selling produce, regardless of the reasons." ECF No. 230 at 17. Rather, in direct response to a question touching directly upon that premise, Dr. Teague explained his conclusion that CHR had a viable market for the Three Grower's produce, but elected to give that business to Alternative Growers:

> Q. Do you assume that C.H. Robinson was required to ship all of the produce that was grown by Sandifer, Rentz, and Townsend in 2018?
>
> A. Again, I don't want to get into the contract or anything like that. You know, "required" is a pretty tough term. I am just saying that while they were shipping and giving orders to these three growers, they were giving a bunch of business to other people. Some or all of that business *could have been* loaded by these growers; certainly more than they did. And that is reflected by the fact that they achieved neither their historical average nor their C.H. Robinson yield projection.

Ex. 2 at 166:14-167:6. In fact, the answer given readily undermines the foundational premise of Defendants' argument: Dr. Teague expressly stated that his opinion was not based upon contractual obligations to receive and sell the full yield but upon CHR's choices in allocating its consigned produce among its contracted growers. *Id.* at 171:20-172:8. It is certainly true, as Defendants point out, that Dr.

Teague expressed the economic motivations of the Three Growers to enter into contracts with CHR to sell their produce. ECF No. 230 at 18 (citing Ex. 2 at 118:16-20, 120:3-6). But the expectation that motivated the Growers to enter into a contract in the first instance is clearly not how Dr. Teague defines the extent of the damages here. His own report and testimony make clear that his assumption is that CHR could have reallocated receipts of consigned produce within the *existing* viable market to make the Three Growers whole relative to their contracts; his calculations are not founded upon assuming a contractual obligation.

For good measure, Defendants are wrong with respect to Dr. Teague's overarching damages opinion because his methodology is sound. While Defendants can certainly disagree with some or all of the variables in Dr. Teague's equations, they do note that he engaged a specific and consistent methodology to reach his conclusions. ECF No. 230 at 17. He estimated the crop yields and compared that with the actual quantities sold to obtain a delta between those figures. He used objective data to allocate that difference into bins and cartons (again, using historical figures to establish that ratio). And then he applied market data to the quantities of bins and cartons and subtracted the expenses of harvesting and packing that produce from the gross value to achieve a maximal net loss on a product-by-product basis. *See* Ex. 3 at 13-17. That is a reliable methodology and supports the admissibility of Dr. Teague's testimony.

Defendants' motion to exclude Dr. Teague should be denied.

## II. Defendants Have Not Established a Basis for Summary Judgment as to Any of the Grounds Raised in Their Motion

### A. Summary Judgment Standard of Review

Summary judgment is proper only when the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). Only "[w]here the record taken as a whole could not lead the trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.*

### B. Plaintiffs Have Viable Damages Claims Against Defendants

Contending that damages are an essential element of each of the pleaded claims, Defendants argue for summary judgment as to Plaintiffs' claims for

violation of the Perishable Agricultural Commodities Act of 1930 (7 U.S.C. § 499a, et seq.), breach of contract, breach of fiduciary duty (both under PACA and under Minnesota state law), and breach of the implied duty of good faith and fair dealing (under Minnesota state law).  ECF No. 177 at 25-35, ¶¶ 72-105.  As to Plaintiffs Townsend, Rentz, and Sandifer, Defendants' argument is based entirely upon the outcome of their motion to exclude Dr. Teague.  As to Plaintiffs Moore and Powe, the arguments depend in part upon certain concessions made during depositions in this case and in part upon other matters.  As discussed below, while Defendants are correct about the effect of the concessions made during depositions, the evidence as to the remainder of the damages issues raises fact questions that preclude summary judgment.

1. **Paul Teague's Opinions are Admissible and are Sufficient to Raise Genuine Issues of Material Fact as to the Damages Suffered by Townsend, Rentz, and Sandifer**

As to Plaintiffs Townsend, Rentz, and Sandifer, Defendants rest their entire argument for summary judgment upon the disposition of their motion to exclude Dr. Teague's testimony.  ECF No. 230 at 20.  But since Dr. Teague's opinions on the damages of those plaintiffs are admissible, Plaintiffs Townsend, Rentz, and Sandifer have sufficient evidence on this record to raise fact questions regarding their damages.  Those fact questions preclude summary judgment as to any of the claims made by Plaintiffs Townsend, Rentz, and Sandifer.

### 2. Even with Some Concessions, there are Fact Questions as to Plaintiff Moore's Damages

As to Plaintiff Moore, Defendants contend that some damages claims are duplicative, and that Moore's corporate representative conceded as much. The effect of that concession is to reduce Moore's damages demand – stripped of the duplicative claims – by $110,725.54. ECF No. 230 at 21-22. Moore concedes that it is bound by the cited testimony of its corporate representative. And because Moore's corporate representative acknowledged the damages claims "listed in Exhibit 633 appeared more than once in Moore's damages spreadsheet," and the multiple references to load number 153083 are duplicative, as Defendants maintain, *see* ECF No. 230 at 21-22, those duplicative claims should not be considered at trial.

Defendants raise two other issues related to Moore's damages, but neither argument provides a basis for summary judgment. First, Defendants contend that Moore cannot prevail on claims related to rejection of old fruit or poor quality fruit by CHR customers. ECF No. 230 at 22-23. But during his deposition, Mr. Moore testified that CHR's representative directed Moore about which melons to harvest, which melons to pack, and which melons to ship. *Moore Depo.* at 89:14-91:8 (Ex. 4). These instructions from CHR supplanted the grower and told them what to harvest, pack, and ship. *Id.* Mr. Moore testified that CHR's representative communicated these instructions on a day-to-day basis with their entire sales team, which knew what Defendants were going to sell. *Id.* Defendants then delivered the product to the buyer, who rejected it, and the product would then

be left on a floor to decay before being dumped and not paid for. *Id.* Moore testified that he did everything according to their instruction, and Defendants "did not sell what they told us to pack." *Id.* By overbearing the contractual allocation of responsibility and assuming final say about those matters for themselves, Defendants should not now be able to point back to a contract term they utterly disregarded as forbidding liability. There is at least a fact question as to whether that conduct caused Moore's damages related to rejected product.

Finally, Defendants argue that Moore cannot recover for losses associated with untimely or missed rejection notifications, claiming Moore is seeking as damages the entire value of the rejected load and not just the benefit of his bargain. ECF No. 230 at 23-24. But in instances where no notice or untimely notice of rejection was given to Moore, the expectation damages associated with the resulting loss would necessarily be the value of the rejected load. After all, if the load is rejected and the grower receives no notice or late notice of the rejection, the produce goes bad, cannot be sold to anyone, and the value of the load becomes something close to zero. In that instance, it is wholly likely that the grower has lost the entire expected value of the load and received nothing to offset that expectation. The parties' contract provides that in instances where notice of rejection is actually and timely given, Defendants may grant price adjustments. *See Moore Contract* at 2, § 5(d)-(e) (Ex. 5). But Defendants retain no such right when notice is not provided or is provided in an untimely manner. *Id.*

Mr. Moore testified to instances in which Defendants failed to meet the contractual notice requirements. *See* Ex. 4 at 88:5-89:12, 117:22-120:11; Ex. 192 (Ex.

6).[5] Defendants dispute this but offer no evidence to justify that dispute. ECF No. 230 at 23. With some evidence to raise a fact question about breach of the notice requirement, there is also a fact question about the extent of Moore's damages arising from that breach. As noted, the operative contract provides no basis for an offset in an instance where notice of rejection is either not sent or is sent late. As such, Moore's proof suffices to support his claim for damages arising from the breach of the notice requirement.

### 3. There are Fact Questions as to Powe's Non-Withdrawn Damages

As with Moore, Powe's corporate representative affirmatively withdrew its claim for one category of damages during her deposition. ECF No. 230 at 24. Having withdrawn its claim for damages categorized as "Load Should Have Been Sold on Contract," summary judgment as to that element is appropriate.

But there are fact questions as to the rest of the damages categories that preclude summary judgment. Indeed, the entirety of Defendants' arguments to the balance of Powe's damages is little more than a mischaracterization of the deposition testimony of Powe's corporate representative. Powe's written discovery responses included spreadsheets detailing 5 non-withdrawn categories of losses: Deduction without trouble ($13,167.00), Missing Boxes and Extra Charges (amounting to $64,972.10), Trucking Delay ($44,352.00), Deduction without Trouble Ticket ($98,911.60), and Paid Different than Billed ($59,264.77). *See Powe Supplemental Ans. to Interrogs* (2/11/2022) at 14-17, 20-26 (Ex. 7).

---

[5] Mr. Moore authenticated this chart through his deposition testimony. Ex. 4 at 117:22-120:10.

Collectively, the spreadsheets collect losses related to more than 60 distinct purchase orders.

Defendants' argument cites only five examples of instances in which they claim that Ms. Proctor could not sufficiently answer questions about a particular purchase order. ECF No. 230 at 25-26. For example, with respect to the 10 or so purchase orders detailed as Missing Boxes and Extra Charges, Ex. 7 at 16-17, Defendants cite two specific purchase orders (147280 and 147977) and claim that Ms. Proctor was insufficiently prepared to testify about each. But even if that were true and provided a basis to preclude Powe from proving those amounts – and Plaintiffs do not concede that is correct – the argument fails to address the proof of losses made through the other purchase orders on that spreadsheet. The same is true with the Deductions without Trouble, *id.* at 22-23, where Defendants cite Ms. Proctor's testimony concerning two specific purchase orders (683316 and 691864) without addressing the 12 other purchase orders described in that spreadsheet. ECF No. 230 at 26. Again, even if Ms. Proctor's testimony as to two spreadsheets may have been unhelpful, it does not foreclose Powe's ability to prove its damages. Defendants attack only one purchase order among approximately 30 on the Paid Different than Billed spreadsheet, Ex. 7 at 24-25, and raise no issues with any of the three purchase orders on the Trucking Delay spreadsheet, *id.* at 20-21.

Even if Ms. Proctor's testimony might impact Powe's ability to prove damages associated with particular purchase orders – and it should not -- Defendants have failed to demonstrate any basis to ignore the totality of Powe's

proof on that ground. Powe has ample evidence to raise genuine issues of material fact as to its damages in this case.

## C.   Plaintiffs' Claims Under PACA are Also Viable

Defendants seek summary judgment as to the statutory claim under the Perishable Agricultural Commodities Act ("PACA"), contending that Plaintiffs have not established a valid PACA claim. ECF No. 230 at 27. For purposes of overcoming that argument, Plaintiffs need only demonstrate that there is a genuine issue of material fact as to the essential elements of that claim. "For a failure to perform claim, PACA's elements include an agricultural commodities transaction and a 'failure to perform any specification or duty, express or implied, arising out of any undertaking in connection with such transaction.'" *Mastronardi Int'l Ltd. v. SunSelect Produce (Cal.), Inc.*, No. 1:18-CV-00737-AWI, 2019 WL 3996608, at *5 (E.D. Cal. Aug. 23, 2019). [6]

PACA regulates the produce industry by promoting fair dealings in transactions involving fruits and vegetables. *Golman-Hayden Co. v. Fresh Source Produce, Inc.*, 217 F.3d 348, 350 (5th Cir. 2000). Congress has reaffirmed that intention over time, explaining when amending the statute that the Act serves "to encourage fair trading practices in the marketing of perishable commodities by

---

[6] Defendants suggest that Plaintiffs must prove that they "failed or refused truly and correctly to account and make full payment promptly" for a qualifying transaction. ECF No. 230 at 27 (citation omitted). While accounting and prompt payment claims are colorable under the statute, no Plaintiff in this action has alleged that Defendants' violation of Section 499b(4) involves a failure to account or make prompt payments. ECF No. 177 at ¶ 78 ("Defendants breached their expressed and implied duties under PACA with respect to their failure to market each Plaintiff's Products by . . . . ").

suppressing unfair and fraudulent business practices . . . and providing for collecting damages from any buyer or seller who fails to live up to his contractual obligation." H.R. Rep. No. 543, 98th Cong., 2d Sess. 3 (1983). The Act expressly provides a laundry list of conduct that it makes unlawful in connection with transactions involving produce. *See* 7 U.S.C. § 499b. That provision of the Act forms the basis for the claims made by these Plaintiffs. *See* ECF No. 177 at 25-26, ¶¶ 73-74. Plaintiffs specifically invoked subsection (4) of that provision, which provides in pertinent part that it is unlawful:

> For any commission merchant, dealer, or broker . . . . to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction; or to fail to maintain the trust as required under section 499e(c) of this title.

7 U.S.C. § 499b(4). Plaintiffs allege that CHR violated that subsection in a variety of ways with each way being applicable to some but not all Plaintiffs. ECF No. 177 at 27, ¶ 78.01-78.06. While one such theory – advanced by Townsend and Rentz – contended that CHR "fail[ed] to endeavor to identify a viable market and sell" their products, ¶ 78.01, that was not the only PACA violation alleged. Indeed, Townsend and Sandifer alleged that CHR "fail[ed] to receive and sell products" they prepared for shipment. *Id.* at ¶ 78.02. And Sandifer and Powe alleged that CHR "fail[ed] to market Products [it] received . . . in a timely fashion based on the shelf life of such Products." *Id.* at ¶ 78.03. Rentz and Townsend alleged that CHR "fail[ed] to accept additional Products which, as a result, were left unharvested and unsold to avoid exacerbating Plaintiffs damages," and "render[ed] each . . .

unable to sell the Products which Defendants chose not to sell, including . . . each Plaintiffs's inability to sell their Products using other produce marketers." *Id.* at ¶ 78.04-78.05.

Here, CHR argues only that the PACA theory fails by characterizing these claims to allege only "that CHR should have sold their produce rather than produce from other growers." ECF No. 230 at 27. And against that characterization, it contends that it had no express or implied duty to refrain from dealing with other growers. *Id.* But that argument fails for either of two reasons. First, by its express language, the operative part of the statute does not confine violations to instances in which a "duty" exists; rather, the statute makes clear that an unreasonable failure to perform "any specification *or duty, express or implied*" can animate a claim. That key term "specification or duty, express or implied" is broad and is understood to "contemplate[ ] a wide range of behavior," and not just the violation of duties spelled out in a contract. *Coosemans Specialties, Inc. v. Dep't of Agr.*, 482 F.3d 560, 564 (2nd Cir. 2007). Accordingly, while it is possible that a PACA claim could be coextensive with a breach of contract claim, the broadly worded phrase certainly is understood to make any unfair practices, whether violative of a contract or not, actionable. *Id.* But second, Defendants' argument misstates the nature of the duty at hand. ECF No. 230 at 27. Plaintiffs do not contend in their pleading or anywhere else that Defendants were precluded from dealing with other growers or that Defendants had to sell Plaintiffs' produce to the exclusion of others. Plaintiffs contend, instead, that Defendants had a viable market to accept contractually negotiated consignments from numerous growers,

including Plaintiffs and that Defendants self-servingly elected to disproportionately seek consignments from the alternative growers instead of Plaintiffs. As Dr. Teague testified, Defendants "could have reallocated some or all of [their orders] to these Plaintiffs. And they didn't do it, for whatever reason. But they had business, they had the orders, and they could have given these three growers more business than they did, and they didn't do it." Ex. 2 at 171:20-172:8. Indeed, Dr. Teague disclaimed any belief that Defendants were required to accept all of Plaintiffs' produce but said that Defendants were giving "a bunch of business to other people," and not to Plaintiffs and "[s]ome or all of that business could have been" allocated to Plaintiffs. *Id.* at 166:14-167:6.

Whether or not that disproportionate allocation of orders away from Plaintiffs and toward other growers constitutes a "fail[ure], without reasonable cause, to perform any specification or duty, express or implied, arising out of" the parties produce transactions is a matter of the jury to decide. There is a fact question as to whether Defendants violated PACA and that fact question precludes summary judgment.

Finally, the foregoing arguments concerning the proof of Plaintiffs' damages suffice to demonstrate an unresolved fact question as to whether they have suffered damages "sustained in consequence" of Defendants' PACA violations.

**D.    Plaintiffs' Breach of Contract Claims Should Go to the Jury Because There are Fact Questions About Whether CHR Actually "Endeavored" to Fulfill its Contractual Obligations**

Plaintiffs' breach of contract claim is permissibly pled as an alternative to their PACA claim. ECF No. 177 at 28, ¶¶ 81-84 (incorporating allegations from

PACA claim); *see D'Arrigo Bros. Co. of New York, Inc. v. KNJ Trading, Inc.*, No. 19-CV-1129 (AJN), 2020 WL 2060355, at *2, n. 1 (S.D.N.Y. Apr. 29, 2020) (collecting cases) (claims made under PACA's remedial scheme can be asserted as an alternative to a breach of contract claim based upon the same conduct). Defendants seek summary judgment as to that claim but again misstate the nature of the allegations Plaintiffs make. As noted, Plaintiffs do not allege that Defendants "should have sold" their produce rather than the produce of others; again, Plaintiffs simply allege that there was a viable market for their product and that Defendants failed to meet their contractual obligation to "endeavor" to identify that viable market and sell Plaintiffs' products into that market. ECF No. 177 at 28, ¶ 82 (citing 26, ¶ 78.01); Ex. 2 at 166:14-167:6, 171:20-172:8.

Each of the relevant contracts imposes a duty upon Defendants to "endeavor to identify a viable market for Products," mandates that they "shall market such Products on a consignment basis," and obligates them to "endeavor to obtain the best prices for the kind and quality of Products" provided by the grower. *See* Ex. 5 at 2, § 5(a)-(b); *Townsend Contract* at 2, § 5(a)-(b) (Ex. 8)); *Rentz Contract* at 2, § 5(a)-(b) (Ex. 9); *Sandifer Contract* at 2, § 5(a)-(b) (Ex. 10); *Powe Cont.* at 2, § 5(a)-(b) (Ex. 11). The gravamen of Plaintiffs' contract theory is that Defendants failed to comply with these duties, and most particularly that they did not endeavor to find a viable market for Plaintiffs' products. ECF No. 177 at 28. The contracts do not appear to define the word "endeavor" to have any meaning other than its common meaning. *See generally St. Paul Fire & Marine Ins. Co. v. Microsoft Corp.*, 102 F.Supp.2d 1107, 1111 (D. Minn. 1999). When used as a verb, to

"endeavor" is to "exert physical or intellectual strength toward the attainment of an object or goal." *See* Black's Law Dictionary, "Endeavor" (12th ed. 2024). The term necessarily requires the demonstration of some effort to meet a specific goal.

Here, there are at least fact questions as to whether Defendants did that with regard to finding a viable market for Plaintiffs' products or to finding the best price for those products. As Dr. Teague notes, Defendants were accepting disproportionate quantities of melons of the sort grown by Plaintiffs Townsend, Sandifer, and Rentz from competing growers in close geographical proximity to each of them. *See* Ex. 3 at 8; Ex. 2 at 114:5-115:1, 164:13-165:20, 166:14-167:6, 171:20-172:8, 176:21-177:17. Defendants' weekly summaries[7] demonstrated that a viable market existed for the products grown by those Plaintiffs; there was enough demand for Defendants to accept more of Plaintiffs' melons while also accepting quantities of melons from other growers. *Id.* But the choice to accept substantially more melons from other those competing growers raises a fact question about whether Defendants endeavored at all to find a viable market for Plaintiffs' produce. ECF No. 230 at 29. Indeed, a jury could reasonably surmise that viable markets existed but that Defendants never "endeavored" to find that market for Plaintiffs' produce (much less that they "endeavored" to get the best price for it)

---

[7] Exhibit 14 is an exemplar of weekly internal CHR emails that reflect it receiving the same produce from multiple growers for the same sizes during the same weekly time frame. Dr. Teague's analysis is based in part upon these records, which demonstrate product received weekly from different growers in the same area.

because they chose instead - for some reason - to receive the same product in disproportionate quantities from competing growers.

Further, as to the Moore and Powe claims related to the quality of their produce, as shown above, there is evidence that Defendants affirmatively overrode the contractual duties associated with the quality issues that form the basis for a claim arising from rejection of the produce. *See supra* at 21-22 (citing Ex. 4 at 89:14-91:8). There are also unresolved factual questions about whether Defendants complied with their contractual obligation to provide timely notice of rejection under Section 5(e) of the Moore contract. *See supra* at 22-23. Each of those fact questions bears directly upon whether Defendants breached the contract; the evidence, viewed in the light most favorable to Plaintiffs, would permit the jury to find that Defendants failed to comply with their obligations. Summary judgment is not proper as to those claims, either.

**E.  Plaintiffs' Breach of Fiduciary Duty Claim is Founded Upon Cognizable Statutory and Common Law Fiduciary Obligations Owed by Defendants to Plaintiffs**

Plaintiffs have stated a claim against Defendants for breach of fiduciary duty. ECF No. 177 at 28-33. Though Defendants suggest that the nature of the claim is "not entirely clear," the Third Amended Complaint readily spells out that the agreements between the parties expressly make Defendants "agents" and "exclusive sales agent" of Plaintiffs. The complaint explains that the fiduciary obligations owed by Defendants to Plaintiffs are derived from two sources: PACA, which deems consignment transactions to be fiduciary in nature and from Minnesota common law, which recognizes that "agents" have fiduciary

obligations to their principals. ECF No. 177 at 29, ¶¶ 89-90. From that legal basis, Plaintiffs allege that Defendants' acts and omissions were self-serving and violative of the statutory and contractual fiduciary duties they undertook relative to Plaintiffs. *Id.* at 32-33. While Defendants' confusion about the nature of the breach of fiduciary duty claim defies the clear allegations in the pleading, their arguments against such a claim relate principally to the existence of a fiduciary duty on these facts. ECF No. 230 at 30-31 (arguing that there is no fiduciary duty here under Minnesota law or the parties' contracts). But the law makes clear, as Plaintiffs allege in their Complaint, that fiduciary obligations arise from both PACA and Minnesota law, and that precludes summary judgment.

### 1. Defendants Owed Plaintiffs a Fiduciary Duty Under PACA

Again, Plaintiffs expressly invoked PACA as a source of a fiduciary duty owed by Defendants. ECF No. 177 at 29, ¶ 89. "PACA is a remedial statute designed to ensure that commerce in agricultural commodities is conducted in an atmosphere of financial responsibility." *Harry Klein Produce Corp. v. U.S.D.A.*, 831 F.2d 403, 405 (2d Cir. 1987). "It is an *intentionally rigorous law* whose primary purpose is to exercise control over an industry which is highly competitive, and in which *the opportunities for sharp practices, irresponsible business conduct, and unfair methods are numerous*." *Id.* (cleaned up; emphasis added).

The protections afforded by PACA are enhanced by the recognition of fiduciary duties owed by commission merchants and their principals. Indeed, since at least 1965, the USDA's disciplinary decisions have consistently recognized that PACA imposes those obligations upon commission merchants. *See In re*

*Mandell, Spector, Rudolph Co.*, 24 A.D. 651 (U.S.D.A. 1965) (Ex. 12). There, the USDA adjudicated a complaint filed against a commission merchant alleged to have "repeatedly and flagrantly violated section 2 of the act (7 U.S.C. 499b) by failing truly and correctly to account . . . for numerous shipments of perishable agricultural commodities received in interstate commerce . . . ." *Id.* The USDA held that by acting as a commission merchant, the respondent "had a *fiduciary* duty to account truly and correctly, to keep adequate and accurate records identifying individual shipments of produce, to remit funds owing and not to commingle the good of its principals or partners with its own or that of others." *Id.* at 695 (emphasis in original). Therefore, "[i]t is axiomatic that in **this position of trust and confidence** discrepancies or confusions created by respondent are to be resolved against it." *Id.* at 695–96 (emphasis added).

Subsequent disciplinary decisions from the USDA only clarify the existence of a commission merchant's fiduciary duty to its consignor. In *Friedmeyer,* the USDA held that "the **consignment transactions** handled by respondent were **fiduciary transactions** in which respondent was required to exercise a high degree of care to protect the interests of the **consignors**." *In re Friedmeyer*, 42 Agric. Dec. 126, 132, 1982 WL 37853, at *5 (U.S.D.A. 1982) (Ex. 13). Five years after *Friedmeyer*, the agency reaffirmed that holding in a case in which the respondent acted as a commission merchant for perishable agricultural products:

> It has long been held by the Department of Agriculture that breaches of a **fiduciary relationship** of the kind which existed between the respondent and its principals is one of the most serious violations of the PACA because that type of relationship calls for a "high degree of care, honesty and loyalty to the **consignors**."

*In re Harry Klein* 46 Agric. Dec. 134, 141, 146, 1987 WL 114975, at *11 (U.S.D.A. 1987) (emphasis added). Other decisions echo that conclusion. *See In re Kaplan's Fruit & Produce Co.*, 44 Agric. Dec. 333, 342, 1985 WL 62974 (U.S.D.A 1985) (holding that respondent's failure to account under PACA was "one of the more serious [violations] under the Act because respondent violated a fiduciary duty it owed to its principals."); *In re Produce Distribs., Inc.*, 58 Agric. Dec. 506, 1999 WL 46537, at *11 (U.S.D.A 1999) (holding that violations of 499(b)(4) "are serious because they involve breaches of fiduciary duty by an agent to its principal. [Respondent], as an agent, owed its consignors a high degree of care, honesty, and loyalty."). Notably, the Second Circuit affirmed the USDA's decision in *Harry Klein*, never questioning that under PACA a commission merchant owes a fiduciary duty to its consignors. *See Harry Klein Produce Corp.*, 831 F.2d at 407.

The longstanding and consistent interpretation of PACA stands firmly in support of the existence of a fiduciary duty here. To deny that commission merchants owe a fiduciary duty to their consignors would ignore history and contravene precedent. Given these decisions—combined with the lack of any statute or case law to the contrary—this Court should hold as a matter of law that such a fiduciary duty exists under PACA.

Because Defendants acted as commission merchants in this arrangement,[8]

---

[8] There does not appear to be any dispute that under the PACA scheme, Defendants are "commission merchants" subject to the statute's requirements. Indeed, in arguing against the applicability of PACA in this case, Defendants do not predicate their argument upon a claim that they are not subject to the statute at all. In any event, Defendants were engaged in the business of receiving

Defendants owed Plaintiffs a fiduciary duty under PACA. *See, e.g. In re Produce Distribs., Inc.*, 58 Agric. Dec. 506, at *11 (U.S.D.A 1999) (holding that violations of 499(b)(4) "are serious because they involve breaches of fiduciary duty by an agent to its principal. [Respondent], as an agent, owed its consignors a high degree of care, honesty, and loyalty."). Because the facts are undisputed in this regard, the Court should find the existence of said fiduciary duty under PACA as a matter of law and deny CHR's Motion.

### 2. Defendants Owed Plaintiffs a Fiduciary Duty Under Minnesota Law

"In Minnesota, an agent owes a fiduciary duty to its principal." *U.S. Bank Nat'l Assoc. v. San Antonio Cash Network*, 252 F. Supp.3d 714, 721 (D. Minn. 2017); *State v. Campbell*, 756 N.W.2d 263, 271 (Minn. App. 2008) (quoting Restatement (Second) of Agency § 13 (1958)) ("it is black-letter law that an agent 'is a fiduciary with respect to matters within the scope of [the] agency.'"). Under the Restatement, "[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1958); *see also Jurek v. Thompson*, 241 N.W.2d 788, 791 (Minn. 1976) (quoting Restatement). Among other things, an agent owes its principal a fiduciary duty to disclose all facts which might affect the principal's rights." *Id.*

---

Plaintiffs' perishable agricultural commodities for sale on commission, leaving no serious doubt that they were commission merchants within the meaning of that term in PACA. *See* Ex. 5 at 2, § 3; Ex. 8 at 1, § 3; Ex. 9 at 1, § 3; Ex. 10 at 1, § 3; Ex. 11 at 1, § 3.

"Where such duties exist, even if arising from a contract, an alleged breach of those duties is distinct from the alleged breach of contract." *Id.* (internal citations omitted). Thus, the Minnesota Supreme Court has held that an agent "must act solely for the benefit of his or her principal in all matters connected with the agency" and that the agent "may not profit from the relationship nor engage in self-dealing without the principal's consent after full disclosure of facts which might affect the principal's decision." *Dahl v. Charles Schwab & Co.*, 545 N.W.2d 918, 925 (Minn. 1996).

More specifically, Minnesota law has long recognized that a consignment relationship, by its very nature, gives rise to a fiduciary duty. *Farmers Co-Op Elevator Co. of Atwater v. Enge*, 148 N.W. 465 (Minn. 1914) (commission merchant failed to account when acting as a factor, or an agent); *Holzer v. Tonka Bay Yachts and Marine Sales, Inc.*, 386 N.W. 2d 285 (Minn. App. 1986) (citing *Farmers* and holding "a consignee, also known as a factor, is bound to exercise the utmost good faith and loyalty to his principal, the consignor); Restatement (Third) of Agency § 6.02 (2006) ("[a] consignment of goods creates an agency relationship between the consignor and the consignee"); *see also Norris v. Boston Music Co.*, 151 N.W. 971, 973 (Minn. 1915) (in consignment sale, property entrusted to "an agent with power to sell," but the "agent, to secure his own debt, wrongfully purported to make an absolute sale of the property to one of his creditors"); *Warner v. Martin*, 52 U.S. 209, 224 (1850) (in consignment sale, "[a] factor or *agent* who has power to sell the produce of his *principal* has no power to affect the property by tortiously pledging it as a security or satisfaction for a debt of his own"); *First Nat. Bank of Blooming*

*Prairie v. Olsen*, 403 N.W. 2d 661, 664 (Minn. App. 1987) ("UCC disregards the intended character of the transaction because every consignment includes an agency or bailment relationship").

Here, the summary judgment evidence at least raises a fact question as to whether Defendants were acting as Plaintiffs' agents via the parties' consignment relationship.[9]  Contractually, the relationship is characterized in that way, and under the applicable Minnesota test, the relationship bears all of the hallmarks of a consignment relationship to which a fiduciary duty attaches as a matter of law. *See Jurek,* 241 N.W.2d at 792, n. 6.  Defendants admit that they did not obtain legal title to the goods received from Plaintiffs, indicating a consignment.  ECF No. 230 at 22.  Plaintiffs were to be paid by Defendants after the produce was sold and proceeds were received and Defendants owed a duty to account for the price, indicating that this was not a sales relationship between the parties to this litigation.  The produce was ready for sale upon departure from the Plaintiffs' facilities, and as Defendants argue in their motion, the risk of loss remained with Plaintiffs until sold.  ECF No. 230 at 22.  PACA regulations confirm that, characterizing Defendants as grower's agents who "sell and distribute produce for or on behalf of growers and others and, in addition, may perform a wide variety of services, such as financing, planting, harvesting, grading, packing, furnishing

---

[9] Defendants wrongly contend that the contract has no provision by which CHR assumed a fiduciary duty and argues that this is just an arms-length commercial relationship.  ECF No. 230 at 30-31.  But the contract has no provision that purports to disclaim a fiduciary duty and manifestly creates a consignor/consignee relationship that is fiduciary in nature as a matter of Minnesota state law and as recognized in the Restatement.

labor, seed, containers, and other supplies or services. They *usually distribute the produce in their own names* and collect payment direct from the consignees. They render accountings to their <u>principals</u>, paying the net proceeds after deducting their expenses and fees." 7 CFR 46.30(b) (emphasis added).

More broadly, under all of the Contracts, Defendants consented to act on Plaintiffs' behalf in selling Plaintiffs' perishable agricultural commodities. *See* Restatement (Second) of Agency § 1(1958). Indeed, the contracts expressly use the term "agent" when referring to Defendants. *See* Ex. 8 at 1, § 3; Ex. 9 at 1, § 3; Ex. 11 at 1, § 3 (all providing "Grower/Supplier hereby appoints [Defendants] as its exclusive sales agent for the sale of all Products"); Ex. 5 at 2, § 3 ("Grower hereby appoints [Defendants] as its exclusive sales agent."). Therefore, it is clear that Plaintiffs "sought this arrangement" and Defendants "consented to it." *Children's Broadcasting Corp. v. Walt Disney Co.*, 245 F.3d 1008 1021 (8th Cir. 2001).

Ultimately, considering the Restatement factors cited by the *Jurek* court, as well as the PACA regulations which govern the relationship between the parties, the relationship between the Defendants and the Plaintiffs was that of consignor and consignee - a fiduciary relationship. Defendants cannot avoid the legal conclusion that their contracts with the Plaintiffs are consignment and agency contracts, under which a fiduciary duty is owed under Minnesota common law. Accordingly, because a fiduciary relationship existed between Defendants and Plaintiffs, the motion must be denied.

**F.    Fact Questions Preclude Summary Judgment as to Plaintiffs' Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing**

Plaintiffs' Fourth Cause of Action alleges a violation of the covenant of good faith and fair dealing that is implied into every contract under Minnesota law.  ECF No. 177 at 33-35; *see also In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995); Restatement (Second) of Contracts § 205.  Plaintiffs allege that Defendants breached that covenant in a variety of ways.  ECF No. 177 at 34-35, ¶¶ 104.01-104.05.  The covenant of good faith and fair dealing is implied into contracts[10] to recognize the duty of one party not to hinder the other party's performance  *Sterling Capital Advisors, Inc. v. Herzog,* 575 N.W.2d 121, 125 (Minn App 1998).  A party must act in good faith in exercising any unlimited discretionary powers in a contract.  *Id.*  As Judge Tunheim has observed, "[w]ithout an implied covenant of good faith, an agreement vesting complete discretion in one party may be illusory." *White Stone Partners, L.P. v. Piper Jaffray Cos., Inc.*, 978 F.Supp. 878, 881 (D. Minn. 1997); *see also CRI, Inc. v. Watson* 608 F.2d 1137, 1142 (8th Cir. 1979).  Thus, the implied covenant is employed "to effectuate the intentions of the parties, or to protect their reasonable expectations."  *Allen v. Thom*, No. A07-2088, 2008 WL 2732218, at *4 (Minn. App. July 15, 2008) (quoting Steven J. Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harv. L. Rev. 369, 371 (1980)).

---

[10]  Under Minnesota law, parties may allege breach of the implied covenant as an alternative theory to a breach of contract claim, based upon the same conduct. *Columbia Cas. Co. v. 3M. Co.*, 814 N.W.2d 33, 38-39 (Minn. App. 2012)

"[G]ood faith performance of a contract includes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *White Stone Partners*, 978 F. Supp. at 881 (citing Restatement (Second) of Contracts § 205 cmt. a)).  Here, good faith means that a person's actions are "done honestly, whether it be negligently or not," while bad faith "is defined as a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties."  *Central Specialties, Inc. v. Minn. Dep't of Transp.*, 5 N.W.3d 409, 415-16 (Minn. App. 2024) (citing *Sterling Capital Advisors, Inc*, 575 N.W.2d at 125).

In this case, there is a fact issue as to whether CHR undertook good faith performance of the parties' contracts or if it had an ulterior motive to not accept products from Plaintiffs.  As shown above, Dr. Teague scoured Defendants' records and applied his expertise in this field to assess that Defendants were disproportionately receiving melons from alternative growers rather than from Plaintiffs, despite the existence of a viable market for Plaintiffs' produce.  *Supra* at 9-11.  That is, Dr. Teague confirmed through his analysis that CHR's own records showed the existence of a viable market.  Defendants made a business decision to contract for the same melons from alternative growers and not Plaintiffs.  *Id*.

But Plaintiffs' contracts were exclusive, such that they could not sell their product to other distributors; if Defendants stopped receiving Plaintiffs' product, the Plaintiffs were left without an outlet for their produce.  Ex. 5 at 1, § 3; Ex. 8 at

1, § 3; Ex. 9 at 1, § 3; Ex. 10 at 1, §3.[11]  An apparent choice by Defendants to receive product from alternative growers while limiting the product received from Plaintiffs is a circumstance beyond the control of the Plaintiffs and is a decision by Defendants to hinder performance under the contracts.   Indeed, Defendants required the Plaintiffs to plant on a certain date, on specified acreage, and to harvest that crop and ship it exclusively to Defendants.   The Defendants were to "endeavor" to find a market for the product, but that obligation is made meaningless if the contract permits Defendants a unilateral right to stop accepting product or to refuse to take product at all where there is a dispute about the availability of a viable market.  Ex. 14.  In the specific context of the good faith and fair dealing claim, the fact that Defendants were receiving melons from the alternatives to the detriment of Plaintiffs (who were bound by their exclusivity covenants) raises a fact question about whether Defendants' choices were driven by some ulterior motive and, hence, undertaken in bad faith.  *Central Specialties, Inc.*, 5 N.W.3d at 415-16.  The jury could certainly infer bad faith on these facts.

---

[11] As shown above, CHR's agreements with Townsend, Rentz, and Moore include schedules that expressly spell out how many acres each grower is to plant, when seeds are to be sent to the greenhouses, when the resulting plants are to be transplanted to the specific acreage, and when harvest is anticipated.  (Ex. 5 at 7-11, Ex. 8 at 6-14, Ex. 9 at 6-12).  Total volumes to be produced by each grower are also specified in these schedules, as the Townsend contract readily demonstrates.  (Ex. 8 at 8-12).  And, as noted, these agreements made CHR the *exclusive* agent for sales of the product of those growers; indeed, in the event that CHR refused to load product, those growers were unable to ship their produce to other receivers.  *See, e.g.* Ex. 8 at 1, § 3 (CHR 000103).

## CONCLUSION AND PRAYER

For the foregoing reasons, and subject to the concessions made regarding the duplicative Moore damages and the withdrawn Powe damages, the Court should deny Defendants' motion, ECF No. 230, in its entirety.

Dated: January 29, 2025

Respectfully submitted,

/s/ *Francisco Guerra, IV.*

**PAUL LLP**
Richard M. Paul III (*pro hac vice*)
Laura C. Fellows (*pro hac vice)*
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Rick@PaulLLP.com
Laura@PaulLLP.com

**GUERRA LLP**
Jennifer Neal (*pro hac vice*)
Francisco Guerra, IV (*pro hac vice*)
Mark Fassold (*pro hac vice*)
875 E. Ashby Place, Suite 1200
San Antonio, Texas 78212
Telephone: (210) 447-0500
jneal@guerrallp.com
fguerra@guerrallp.com
mfassold@guerrallp.com

**LOYD & POLLOM, PLLC**
Robert A. Pollom (*pro hac vice*)
12703 Spectrum Drive, Suite 201
San Antonio, Texas 78249
Telephone: (210) 775-1424
Robert@LP-Lawfirm.com

**STOKES LAW OFFICE LLP**
Craig A. Stokes (MN Bar No. 0390849)
PO Box 6909
San Antonio, Texas 78209
Direct Telephone: (210) 742-2789
Telephone: (210) 804-0011
cstokes@stokeslawoffice.com

## ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 29th day of January, 2025, a copy of the foregoing was sent to all counsel of record by the use of the CM/ECF notice of electronic filing system.

*/s/ Francisco Guerra, IV.*